ESTATE OF LEON SPEAR, DECEASED, JEANETTE SPEAR, HARVEY SPEAR, AND ROBERT SPEAR, ADMINISTRATORS, AND JEANETTE SPEAR, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of Spear v. Commissioner
Docket Nos. 3276-87, 21480-90, 21481-90
United States Tax Court
T.C. Memo 1993-213; 1993 Tax Ct. Memo LEXIS 208; 65 T.C.M. (CCH) 2668; T.C.M. (RIA) 93213; May 18, 1993, Filed; As Amended May 25, 1993 *208 R determined deficiencies and additions to tax for 1975, 1976, and 1977 using the net worth plus expenditures method. Ps claim that the increase in net worth determined by R was due to expenditures from a $ 380,000 cash hoard and loan repayments. Petitioner Jeanette Spear failed to comply with a Court order to appear at trial. At trial, the Court concluded that her refusal to appear was a manipulation to avoid her testimonial responsibilities. The Court sanctioned Ps by ordering that R is deemed to have made a prima facie showing of facts stated in the amended answer relating to R's fraud allegation. Held: The sanction imposed on Ps is proper. Held, further, R's determination of deficiencies as amended is sustained. Held, further, additions to tax for fraud under sec. 6653(b) are sustained. For petitioners: Barry A. Furman, Patrick W. Kittredge, and Michael S. Paul. For respondent: Michael P. Corrado, Ruth M. Spadaro, and James C. Fee, Jr. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined deficiencies in income tax for petitioners as follows: Additions to Tax
Year
Deficiency Sec. 6653(b)
1975
$ 51,271.70
$ 25,635.85
1976
157,706.46
78,853.23
1977
93,536.23
46,768.12
*209 Respondent determined petitioners had unreported income in 1975 through 1977. Petitioners contend they received a cash gift of $ 380,000 from petitioner Leon Spear's father in 1957. In response to petitioners' contention, respondent alternatively determined a deficiency against the Estate of Abe Spear or Estate of Leon Spear, transferee, in gift tax for 1957 of $ 72,555, plus related additions to tax. After concessions, the issues for decision are: 1. Whether the Court's order that respondent is deemed to have made a prima facie showing of facts stated in the amended answer is a proper sanction for petitioner Jeanette Spear's unreasonable failure to testify at trial. We hold that it is. 2. Issues relating to the net worth method: (a) Whether Abe Spear gave Leon Spear a $ 380,000 cash gift in 1957. We hold that he did not. (b) Whether various payments from petitioners' corporations in 1975, 1976, and 1977 were loan repayments. We hold they were not. (c) Whether respondent's determination was arbitrary. We hold that it was not. (d) Whether respondent established a likely source of income and sufficiently investigated and negated leads. We hold that respondent did. 3. *210 Whether the following rulings at trial were proper: (a) That the deposition of J. Gilbert Brown, petitioners' former accountant, in a prior lawsuit by Leon Spear against Brown, is inadmissible; (b) that Leon Spear's deposition in that lawsuit is inadmissible; (c) that Robert Wilson's testimony in the criminal trial of petitioner Leon Spear was inadmissible. We hold that these rulings were correct. 4. Whether petitioners are liable for additions to tax for fraud under section 6653(b). We hold that they are. 5. Whether the statute of limitations bars assessment of tax from petitioners for 1975, 1976, and 1977. We hold that it does not. 6. Whether the Estate of Abe Spear is liable (directly or as a transferee) for gift tax and related additions to tax based on the claimed $ 380,000 cash gift in 1957. Having found that there was no such gift, we hold that petitioner Estate of Abe Spear is not liable for gift tax thereon. References to petitioners are to Leon and Jeanette Spear. References to the Spears are to petitioners and their sons, Robert and Harvey. All references to the City are to Philadelphia. All street addresses are in Philadelphia. Neither petitioner testified *211 at trial. References to their testimony are to Leon Spear's testimony in his criminal case and to a deposition taken from Jeanette Spear in this case, both of which are included in this record. Unless otherwise provided, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT 1. Petitioners
Petitioners were husband and wife who lived in Philadelphia, Pennsylvania, when they filed the petition. They had two sons, Robert and Harvey. Leon Spear had a used car business from 1946 to 1956. Later petitioners operated a parking lot business, discussed below. Leon Spear suffered a stroke on October 31, 1989, and died on November 15, 1989. From 1972 through 1977, petitioners maintained safe deposit boxes and entered those boxes frequently. There is no evidence that petitioners had a safety deposit box before 1972. On April 5 and June 4, 1973, petitioners leased safe deposit boxes from the Frankford Trust Co. Petitioners leased safe deposit box from First Pennsylvania Bank on August 8, 1975. On October 28, 1977, petitioners exchanged the two boxes *212 at Frankford Trust Co. for a larger box. Petitioners entered their Frankford Trust Co. safe deposit boxes 57 times in 1973, 55 times in 1974, 54 times in 1975, 22 times in 1976, and 23 times in 1977. Petitioners' lifestyle was not extravagant. On January 29, 1973, petitioners bought their residence at 7601 Leonard Street, for $ 29,269.71, of which $ 18,600 was paid by a mortgage. One of petitioners' corporations (described below) bought a new 1976 Pontiac Grand Prix for Leon Spear in 1976. It was his only vehicle. In addition, Jeanette Spear had an older car. 2. Petitioners' Criminal Case
On July 1, 1982, petitioners were indicted in the United States District Court for the Eastern District of Pennsylvania. Counts one and two of the indictment charged petitioners with tax evasion for 1976 and 1977; count three charged Leon Spear with violating section 7206(1); and count four charged Jeanette Spear with violating section 7206(2). The court dismissed counts three and four. Petitioners were tried on counts one and two in January 1983, and acquitted on March 21, 1983, after the judge declared a mistrial. 3. Petitioners' Claimed $ 380,000 Cash Gift From Abe Spear
*213 These facts relate to petitioners' claim that Leon Spear's father, Abe Spear, gave Leon Spear $ 380,000 in cash in 1957. a. Abe Spear
Abe and Rose Spear had seven children: Leon Spear (petitioner), Sidney Spear, Benjamin Spear, Bernard Spear, Morris Spear, Sadye Spear Zibelman, and Pearl Spear Moss. Rose Spear died in 1955. Abe borrowed money from his children to pay for his wife's funeral expenses. Abe Spear paid some bills late, including real estate taxes and water and sewer costs. He borrowed $ 1,000 from his daughter, Sadye Spear Zibelman, in 1954, to lend to his other daughter, Pearl Spear Moss, to help her buy a house. Abe Spear died on August 25, 1957. In his will he appointed his son Morris Spear, and son-in-law Nathan Zibelman, as executors of his estate. When he died, Abe owned real property worth about $ 80,000 subject to mortgages totaling about $ 26,000. He also had $ 3,714.65 in cash in banks. Neither Abe Spear nor his estate filed a gift tax return in 1957. During the criminal trial petitioners presented some old currency, including $ 50 and $ 100 bills issued from 1928 to 1950 to support their cash gift claim. 4. Petitioners' Parking Lot Business *214 -- Overview
From 1975 through 1977, petitioners were the sole shareholders of Ezy Parks, Inc. (EZ), Ezy Parks II, Inc. (EZ II), and Tumble Down, Inc. (TD) (the corporations), through which they operated parking lots. TD also demolished buildings and acquired interests in real property for parking lots. Petitioners and their sons ran the business. a. Verification of Parking Lot Receipts
Attendants issued tickets to and collected revenues from parking customers. Each attendant started his shift with a new settlement sheet beginning with the last ticket number from the previous attendant. At the close of each shift, attendants were required by the City and petitioners to enter the closing number of the tickets on the settlement sheets, to subtract the number of tickets sold, and to list the parking prices for tickets sold. One of the Spears or a supervisor visited the lots several times a day to check the settlement sheets, to ensure that all tickets were recorded, to collect cash, and to make sure that tickets on the cars matched tickets stubs held by attendants. Robert Spear worked for petitioners' corporations as a parking lot attendant during high school and college, *215 until 1973. He became EZ's general manager or vice president in 1973 and was responsible for its daily operations. From 1973 through 1975, Robert Spear checked the lots to make sure that all cars parked had been issued a ticket. Robert Spear was also president of TD, and he worked for EZ II beginning in January 1976. Michael McCuen and Don Wisneuski, were managers in 1977. Petitioners never told Mr. McCuen not to issue tickets, destroy tickets or permit patrons to park without issuing a ticket. If the figures on the daily receipts did not match the settlement sheets, the attendants were held accountable for missing tickets or funds. Petitioners reported some thefts of tickets to the Philadelphia Police Department and on City parking lot returns, and reduced the municipal parking tax accordingly. On March 16, 1976, EZ received a certificate of approval from the City for the parking lot at 221 North 9th Street which stated that all parking checks and/or stickers were found to comply with the tax code and that tickets could be used by the lots. In 1976 petitioners' parking lot corporations established an office in a trailer at 1500 Vine Street. 5. Ezy Parks, Inc.
EZ *216 was incorporated on December 26, 1956. During the years in issue, EZ operated the following lots: a. 811-841 Race Street Lot (9th and Race Streets)
Petitioners purchased part of the 811-841 Race Street lot in about 1956 and additional parts in the 1960s. By 1970 the lot was paved. There was some repaving in 1977 due to construction of a commuter tunnel. The lot had a licensed capacity of 210 cars in 1975 and 1976 and 241 cars as of August 19, 1977. It operated weekdays from 6 a.m. to 9 p.m., and on weekend afternoons. EZ reported its parking rates to the City of Philadelphia, Department of Licenses and Inspections (L & I) for this lot as follows: On April 26, 1976, $ 1.35 all day and $ 1 for 1 hour after 5 p.m.; on March 23, 1977, $ 1.45 for all day if paid before 9 a.m., and $ 1.60 for all day if paid after 9 a.m.; on May 5, 1977, $ 1.35 for all day if paid before 9 a.m., $ 1.50 for all day if paid after 9 a.m., and $ 1 after 5 p.m.; on June 30, 1977, $ 1.25 on Friday and Saturday nights after 5 p.m.; on August 1, 1977, $ 1.45 before 9 a.m., and $ 1.60 for all day after 9 a.m.; on September 7, 1977, $ 1.45 before 9 a.m., $ 1.60 after 9 a.m., $ 1.10 for 1 hour, $ 1.25 *217 for Friday, Saturday, and Sunday after 5 p.m., and $ 1 for Monday to Thursday after 5 p.m. b. 13th and Vine Streets Lots (254-256 N. 13th Street)
In 1972, EZ leased the lot at 256 N. 13th Street. On January 27, 1975, and March 18, 1976, respectively, EZ leased from the Pennsylvania Department of Transportation (PennDot) parking lots at 1334-1336 Vine Street and the southeast corner of Broad and Vine Streets. EZ also acquired the lot at Clarion and Vine Streets and four lots operated as the 13th and Vine Street lots. The 13th and Vine Street lots were near Hahnemann Hospital. EZ began operating these lots in 1975, and leased the property month-to-month from March 1, 1975. It operated daily from 7 a.m. to 9 p.m. EZ blacktopped the lot at 254-56 North 13th Street in June 1976. On June 10, 1976, John J. Dougherty & Son gave petitioners an invoice for grading, stoning, and paving three of the four 13th and Vine lots for $ 6,889.50. c. 1500 Vine Street Lot (1500 Summer Street)
EZ began operating this lot in late 1973 or early 1974. TD or EZ leased the property at 15th and 16th Streets, north of Spring Street, on July 28, 1976. In 1976 and 1977, EZ could not use a 40 *218 by 400 foot area of this lot as a parking lot due to hospital construction. Rent was reduced accordingly. Hahnemann Hospital paid for paving the lot acquired in 1976 as a part of an exchange. This lot operated daily from 6 or 7 a.m. to 8:30 or 9 p.m. One attendant worked a few hours on weekends because business was sparse. d. Bicentennial Lots
On March 15 and July 5, 1977, EZ leased the following lots from PennDot: 6th to Randolph Streets, between Wood and Callowhill Streets; Callowhill to Wood Streets, 7th to Marshall Streets; Wood to Callowhill Streets, 5th to Randolph Streets; Wood to Callowhill Streets, 6th to Marshall Streets; north side of Vine Street to Wood Street, Marshall to 7th Street (the Bicentennial lots). EZ operated these lots for 7 months in 1977. 6. J. Faunce, Inc.
Petitioners incorporated J. Faunce, Inc. (JF), on April 7, 1976. Petitioners' merged JF into one of their parking lot corporations around 1981. a. 1219-1227 Summer Street
JF purchased this lot on July 15, 1977, and EZ began operating it in September 1977. It had a licensed capacity of 44 cars, and operated during the day on weekdays. 7. Tumble Down, Inc.
Petitioners *219 incorporated TD in 1958 and merged it into one of their parking lot corporations around 1981. TD operated two lots. a. 19-27 South Third Street Lot
TD leased this lot in late 1973 or early 1974. It was a private lot which TD converted to a public lot. It was paved when TD began leasing it, and had a licensed capacity of 25 cars. TD operated it 2-1/2 months in 1975, 7 a.m. to 5 p.m., and a half day on Saturday. b. Southwest Corner Broad and Vine Streets Lot
TD leased this lot near Hahnemann Hospital in March 1974, and operated it from 1975 to August 1976. It was part of the 1500 Vine Street lot which was traded for the property adjacent to the 15th and Vine Streets lots on July 28, 1976. 8. Ezy Parks II, Inc.
Petitioners incorporated EZ II on November 13, 1975. EZ II operated six parking lots. a. 314 South Broad Street (Broad and Delaney)
EZ II operated this lot from January 1976 to September 19, 1977. It was near the Academy of Music and Shubert Theater. It operated from 7 a.m. to 7 p.m. or 11 p.m., including weekends, if there were performances. It had a capacity of 30 to 35 cars, and was paved before EZ II acquired the lease. b. 1513 Pine *220 Street (Pine and Hicks Streets)
EZ II opened this lot in September 1976. It operated weekdays from 7 a.m. to 8 p.m., and a half-day on Saturdays. It had mainly all day parkers. c. 1414-1420 Spruce Street Lot
This lot was near the Shubert Theater and Academy of Music. EZ II began operating it in January 1976. In April 1976, EZ II received a 1 year zoning permit from the City to operate this lot. EZ II operated this lot and the 1423-1425 Spruce Street lot in 1976 and 1977. The licensed capacity of this lot was 97 cars. It operated from 7 a.m. to 7 p.m. or 11 p.m., 7 days a week, if there were performances. Parking at this lot cost approximately $ 3. On April 28, 1977, EZ II reported the parking rates to L & I as $ 1 per hour, $ 2 up to 6 p.m., $ 1 after 6 p.m., with an extra fee for cars not paid by 6 p.m., and $ 2 for evening parking. On May 22, 1977, EZ II reported its rates to L & I for this lot as $ 2.25 for all day. d. 1423-1425 Spruce Street Lot
TD leased this lot on November 1, 1976. It was paved when TD leased it. TD agreed to renovate the footways and driveways as required by the City's Highway Department. This lot had a licensed capacity of 15 *221 to 25 cars. TD operated the lot from 7 a.m. to 8 p.m. with the lot at 1414-1420 Spruce Street. It was near the Shubert Theater and the Academy of Music, and was open evenings and weekends when there were performances. e. 1120-1130 Race Street Lot
JF bought this property on October 4, 1977, and leased it to EZ II to operate as a parking lot. EZ II operated it weekdays from 6:30 or 7 a.m. to 6 p.m. The licensed capacity was 72 cars. f. 1219-1221 Arch Street Lot
EZ II leased this lot on a month-to-month basis on September 1, 1977, and operated it for 4 months in 1977. It was paved before EZ II leased it, and had a capacity of 19 cars. EZ II operated it weekdays from 7 a.m. to 5 p.m. 9. Philadelphia Parking Lot Tax Rules And Procedures
The City required parking lot corporations to order all parking tickets through a registered publishing house, to keep a record of all tickets sold, to report monthly to the City the previous month's activities, and not to destroy tickets until audited by the City. The City required the corporations to time-stamp each ticket when issued and to keep daily settlement sheets which itemized the number of cars on the lots and each *222 rate. Petitioners transferred information from the settlement sheets to a loose-leaf book. They destroyed the daily settlement sheets for the years in issue when they destroyed the tickets. The City conducted seven spot checks for tickets on cars at the lots during the years in issue with the following results: Licensed
Number
Were all cars
Date
Parking lot
capacity
parked
ticketed?
1976
March 9
811-817 Race St.
210
261
Yes
Sept. 20
811-17 Race St.
210
251
Yes
Nov. 16
811-17 Race St.
210
231
Yes
1977
March 31
811-17 Race St.
210
224
Yes
June 23
254 N. 13th St.
33
134
Yes
June 23
15th & Summer
148
341
Yes
Aug. 9
15th & Summer
74
353
Yes
15th & Vine
All parked cars were ticketed and petitioners were in compliance with City regulations requiring the posting of signs, maintaining a register for weekly and monthly parking, and using a time clock. Petitioners generally posted the parking rates that they charged for each lot. However, on several occasions during the years in issue, petitioners' corporations violated City requirements to post rate signs. Petitioners' corporations bought and sold some cars during the years in issue. *223 Petitioners' corporations received commissions from sales from vending machines on their lots, and deposited income from the vending machines in their personal bank accounts. Petitioners' corporations frequently drafted and cashed checks payable to the corporations and expensed them to various categories in the corporate cash disbursement journals. The corporations did not produce any substantiation for those expenses. Petitioners regularly cashed employee checks with cash from the corporations and deposited the checks in their personal accounts. 10. Books and Records and City Parking Lot Tax Returns
Jeanette Spear prepared the City parking lot tax returns for the corporations, and kept the books and records, including the check disbursement journals. EZ hired Adrienne Wolf (Wolf), then a high school student, as a part-time clerk. She is now Adrienne Singer. She worked from October 1975 to February 1978, for 4 to 5 hours each week. Jeanette Spear supervised her work. Wolf prepared payroll checks, placed parking ticket information in loose-leaf binders, and made entries in the cash disbursement journal for petitioners' corporations. She recorded the date, payee, *224 and amount of each check in the cash disbursements journals. She did not record the check numbers. Wolf recorded checks in the journals from the check stubs, not from the checks. She did not help prepare petitioners' Federal individual income tax, corporate income tax, or City parking lot returns. Several weeks before Wolf's interview on July 24, 1978, with respondent's special agent assigned to the criminal investigation of petitioners, Jeanette Spear told Wolf to answer all questions truthfully. J. Gilbert Brown (Brown) performed accounting services for petitioners and the corporations from 1970 through the years at issue, except for 1976 for EZ II. He or someone else in his office prepared petitioners' individual and corporate Federal income tax returns. If another member of Brown's firm prepared a form, Brown reviewed it. Milton Krupnick, C.P.A., prepared the Form 1120 for EZ II for 1976. Petitioners did not give Brown copies of their corporation's City parking lot returns, and Brown did not consider those returns when he prepared petitioners' individual and corporate Federal tax returns. Brown described petitioners as unsophisticated in tax related matters. In 1976, *225 Brown had the bank deposit receipts showing deposits for EZ. On June 24, 1983, petitioners and their corporations sued Brown, alleging malpractice in the preparation of their personal and corporate Federal income tax returns. Brown settled the case with petitioners for $ 199,000. Petitioners signed a general release that provided that the payment was not an admission of liability by Brown. Brown was indicted on April 26, 1986, for wilfully making fraudulent misrepresentations and using documents knowing that they contained fraudulent statements during the audits of six clients not related to petitioners or their corporations, in violation of 18 U.S.C. 1001 (1988). Brown pleaded nolo contendere to each count. 11. Petitioners' Use of Corporate Funds
Petitioners diverted corporate funds for their personal use as follows: a. Corporate Payments to Petitioners Not Recorded on Corporate Books
Recorded
Paid
on corp.
Use of funds Date
Amount
by --
books?
Payee
and comments 1975 -- Total ($ 12,000)
July 3
$ 2,000
EZ
No
Leon Spear
Deposited in
1260
petitioners' personal account Aug. 23
5,000
EZ
No
Leon Spear
Deposited in
1365
petitioners' personal account Sept. 19
5,000
EZ
No
Leon Spear
Deposited in
1422
petitioners' personal account 1976 -- (Total $ 60,500)
Mar. 9
$ 500  EZ
No
Cash
Cashed by Leon Spear
1873
Apr. 8
30,000
TD
No
Deposited in
petitioners' personal account Aug. 6
5,000
TD
No
Petitioners
Petitioners bought a
1239
CD in their name Oct. 21
25,000
EZ
No
Petitioners
Deposited in
petitioners' personal savings account. 1977 -- (Total $ 51,149)
May 26
17,149
TD
No
Petitioners deposited
it in their personal accounts July 12
24,000
EZ
No
Petitioners bought
property in name of J. Faunce Sept. 28
10,000
EZ
No
Petitioners bought
property in name of J. Faunce *226 b. Corporate Payments to Petitioners Which Were Misclassified in Corporate Books or Unreported By Petitioners
1975 -- (Total $ 41,000)
May 16
5,000 TD
Maintenance
Petitioners bought
of lots
a CD in their name July 3
2,000 TD
Loan Leon Spear
Deposited in
repayment
petitioners' checking account Aug. 1
20,000
EZ
Loan Petitioners
Deposited in
repayment
petitioners' checking account Aug. 1
4,000 TD
SA Petitioners
Deposited in
petitioners' account Aug. 23
2,000 TD
TD Leon Spear
Deposited in
petitioners' savings account Sept. 18
3,000 TD
Bonus
Leon Spear
Deposited in
petitioners' savings account; petitioners did not report this payment on their 1975 Federal income tax Sept. 19
5,000 EZ
EZ I Leon Spear
Deposited in
savings
petitioners' account
savings account 1976 -- (Total $ 12,750)
Mar. 25
8,200 EZ II
yes, no
Leon Spear
Deposited in
description
petitioners' savings account Apr. 30
600   EZ II
Loan Leon Spear
Unknown
July 15
150   EZ II
Loan Leon Spear
Unknown
July 21
600   EZ II
Loan Leon Spear
Unknown
Oct. 22
150   EZ II
Yes, no
Leon Spear
Unknown
description
Nov. 17
500   EZ II
Yes, no
Leon Spear
Unknown
description
Dec. 22
2,550 EZ II
Yes, no
Leon Spear
Deposited in
description
petitioners' account 1977 -- (Total $ 8,463.31)
Sept. 21
7,000
EZ
Leon Spear
Deposited in
petitioner's checking account Nov. 15
1,463.31 TD
Petitioners
Deposited in
petitioners' checking account *227 c. Corporate Payment of Petitioners' Personal Expenses
1975 -- (Total $ 19,608.75)
Nov. 17
3,000 EZ
No First
Petitioners' IRA's
Federal S&L
Dec. 12
5,000 EZ
Loan to
IVB
EZ II Checking
start EZ II
account Nov. 12
3,500 EZ
No Leopold,
Payment for
Malcolm,
real property etc.
condemnation proceedings not involving EZ Dec. 19
1,275 EZ
Legal
Schnader,
Deposited in
Harrison
Schnader, Harrison services
account for personal legal Dec. 29
5,825 EZ
No Adam
Down payment
Pontiac
on 1976 car titled to Leon Spear. Dec. 30
700   EZ
No Adam
Payment on
Pontiac
a 1971 car 10 dates
308.75   TD
Rent 1500
Apartment rental
Management
for Robert Spear at 1500 Locust Corp
1976 -- (Total $ 20,682.61)
Nov. 17
1,500 EZ
IRA
Harvey,
Petitioners'
1,500 Leon, and
and Harvey 1,500 Jeanette
Spear's IRA's Spear
Apr. 15
500   EZ
Bonus
Harvey and
Personal use
3,000 Robert
3,500 Spear
3 dates
179.36   EZ
Rent Frankford
Mortgage on
Trust
petitioners' residence Jan. 12
374.50   EZ
No Adam
Payment of
Pontiac
balance due on 1976 car titled to Leon Spear Mar. 25
1,650 EZ
No Adam
To buy a
Pontiac
1969 Pontiac and a 1973 Chevrolet Apr. 14
2,200 EZ
Parts &
Adam
To buy a 1973
Supplies Pontiac
Buick
June 30
2,200 EZ
Parts &
Ezy Parks
To buy a
Supplies 1969 Pontiac and 1973 Chevrolet from Adam Pontiac July 26
1,400 EZ
No Adam
To buy a 1972 Ford
Pontiac
Pinto
Aug. 7
850   EZ
No Adam
Used by Harvey Spear
Pontiac
to buy a 1971 Dodge
4 dates
308.75   TD
Rent 1500
Apartment rental for
Management
Robert at 1500 Locust
Corp
1977 -- (Total $ 23,000)
Nov. 27
9,000 EZ
No Leon Spear
IRA 11,000
EZ
No Jeanette Spear
IRA 500   EZ
No Robert Spear
IRA 500   EZ
No Harvey Spear
IRA Nov. 27
500   EZ II
No Leon,
IRA 500   EZ II
No Jeanette,
IRA 500   EZ II
No Robert and
IRA 500   EZ II
No Harvey
IRA *228 The one bedroom apartment discussed above was in a residential building that did not allow commercial tenants. It had a kitchen, bath, and was furnished with chairs, tables, a desk, and pull-out couch. The apartment lease was in Robert Spear's name and the notations on the rental checks were for Robert Spear's apartment. Checks were posted in the rent column of the cash disbursement journal for Harvey and Robert Spear. 12. Jeanette Spear's Refusal to Testify
Over a long period of time, petitioners resisted respondent's efforts to obtain Jeanette Spear's testimony at the trial of this case. Jeanette Spear refused to be available for a court-ordered examination with a qualified examiner chosen by respondent to evaluate petitioner's claim that she was not physically or mentally able to testify by deposition or at trial, and refused to appear at trial in response to respondent's subpoena and a Court order. a. November 5, 1990, Calendar
On April 3, 1990, the Court calendared these cases for trial at a session starting November 5, 1990. We set the trial for November 9, 1990. On October 25, 1990, petitioners moved to continue the trial and for an order to preclude *229 Jeanette Spear's testimony on physical and mental health grounds. The motion to continue was granted. Petitioners pointed out that Leon Spear had died on November 15, 1989. Petitioners alleged that the Tax Court case was very much on his mind and that his concern contributed to his death. On November 2, 1990, Dr. Sol B. Barenbaum, a licensed psychologist chosen by respondent, evaluated Jeanette Spear and concluded that she was mentally and physically capable of testifying at trial. On November 5, 1990, Jeanette Spear was taken by ambulance to the psychiatric unit at Nazareth Hospital and admitted by Dr. Martin J. Durkin. Dr. Durkin was told that she had attempted suicide by turning on the gas burners at her home, and possibly taking pills. On November 6, 1990, petitioners moved for a continuance on the grounds that petitioner had attempted suicide. Petitioners attached a letter from Dr. Durkin stating that Jeanette Spear suffered from a psychotic depression and that she should remain hospitalized for at least 2 to 3 weeks. The Court continued the trial on November 6, 1990. On November 7, 1990, Robert Spear requested that Jeanette Spear be released. Dr. Durkin allowed Jeanette *230 Spear to leave the hospital 7 to 11 hours each day on November 9, 10, and 11, 1990. Dr. Durkin's discharge summary stated that "On November 12, 1990, the patient is pleasant, friendly, verbal, and well able to reach goal ideas. I see her as making rapid recovery." Dr. Durkin evaluated Jeanette Spear on December 10, 1990, and January 3, March 18, and April 15, 1991. Other than these evaluations, there is no evidence that Jeanette Spear had any further treatment or problems until the next time the case was set for trial. b. February 25, 1992, Calendar
On July 5, 1991, respondent applied for an order to take the deposition of Jeanette Spear. Petitioners objected on grounds that it would endanger her life or health. Petitioners moved for a ruling that Jeanette Spear is unavailable to testify at trial, or by deposition, or to answer interrogatories because she is incapable of giving coherent testimony and it would endanger her life or health. On August 8, 1991, the Court set the case for trial on February 25, 1992. On August 8, 1991, respondent moved for a physical and mental examination of Jeanette Spear by a psychiatrist or psychologist chosen by respondent. Petitioners *231 opposed respondent's motion on the grounds that it posed a substantial risk to Jeanette Spear's life and health. c. August 26 Order for a Psychiatric Examination
On August 26, 1991, the Court granted respondent's motion, and ordered that Jeanette Spear be examined by a board certified psychiatrist selected by respondent no later than September 10, 1991. On September 6, petitioner's counsel told respondent's counsel that Jeanette Spear had an anxiety attack and would not be available for an examination. On October 16, 1991, petitioner's counsel wrote to respondent that Harvey and Robert Spear decided, along with Jeanette Spear's psychiatrist, that another psychiatric examination would endanger her health and life. On October 24, 1991, respondent moved to impose sanctions for failure to comply with the Court's August 26, 1991, order. Petitioners objected claiming that they were acting in good faith and that Jeanette Spear had no direct knowledge of the major issues in this case. Petitioners agreed to a deposition at petitioners' counsel's office. Respondent listed Jeanette Spear on respondent's witness list dated November 12, 1991, and later subpoenaed her to appear at *232 trial. On December 12 Jeanette Spear testified in a videotaped deposition. d. February 20, 1992, Orders for Jeanette Spear to Testify at Trial
On February 17, 1992, petitioners' counsel notified respondent that Jeanette Spear would not appear as as a witness at trial. On February 18, respondent moved under Rule 123 to compel Jeanette Spear's testimony at trial, or for sanctions. On February 19, petitioners filed an affidavit of Dr. Durkin in which he stated his opinion that Jeanette Spear's physical and emotional health would be at risk if she were to testify in Court. On February 20, 1992, the Court ordered Jeanette Spear to testify at about 1:45 p.m. on Monday, February 24, 1992. Petitioners' counsel told the Court that Jeanette Spear would not appear. Respondent offered to accept her deposition as testimony to reduce the time for her testimony and to conduct 1 to 2 hours of testimony in a conference room in an atmosphere essentially like that in which she had successfully completed the videotaped deposition. Petitioners rejected this arrangement. Petitioners requested that the Court schedule a hearing for Tuesday, February 25, 1992, at which Dr. Durkin would testify *233 about Jeanette Spear's good faith for purposes of avoiding the sanction of dismissal. The Court denied the request because it would disrupt the trial schedule previously set. The Court allowed petitioners to supplement the record before 1:30 p.m. on February 24. Harvey and Robert Spear took Jeanette Spear to Nazareth Hospital on February 23, 1992. She was admitted at 5:27 p.m. Her chief complaint was "I am very upset." When she was admitted, Jeanette Spear indicated that she had a prescription for valium. One of her sons said that she was abusing an old medical prescription of valium over the weekend. Subsequent urine and blood tests showed no evidence of valium or any other inappropriate chemical substance. Jeanette Spear remained admitted at 1:30 p.m. the next day, February 24, when petitioner's counsel reported to the Court that Jeanette Spear was still in the hospital. At about 1:45 p.m., the Court granted respondent's motion for sanctions. The next day, on Tuesday, February 25, 1992, between 2:45 p.m. and 4:30 p.m., with the help of her sons, Jeanette Spear collected her belongings and left the hospital. Hospital personal contacted security and Dr. Durkin. At 5:30 *234 p.m., Mrs. Spear called the hospital and said that she was at home and fine and that she did not want to return to the hospital. She was released from the hospital at that time. The trial in this case lasted until Thursday, February 27. Petitioners' counsel did not tell the Court Jeanette Spear had left the hospital, or provide a medical report about her condition during the trial. The Court allowed petitioners to supplement the written record after trial with Jeanette Spear's medical records. OPINION 1. Sanction Imposed on Petitioners
A taxpayer may be compelled to testify if no privilege applies. Dellacroce v. Commissioner, 83 T.C. 269, 278 (1984); Rechtzigel v. Commissioner, 79 T.C. 132, 137-139 (1982), affd. 703 F.2d 1063 (8th Cir. 1983) (taxpayer refused to comply with Court discovery order; default judgment granted to respondent for section 6653(b) addition to tax); Harper v. Commissioner, 54 T.C. 1121, 1138 (1970) (Court reviewed). We must decide whether petitioner's refusal to testify was based on bona fide health reasons, or was an improper *235 attempt to escape her testimonial obligations. We conclude it was the latter, and that this Court properly granted respondent's motion for sanctions at trial. a. Petitioner's Conduct
We conclude that Jeanette Spear's refusal to testify was an improper attempt to avoid her testimonial duties because: i. On two occasions Jeanette Spear was hospitalized on the eve of trial, but discharged soon after the time scheduled for her to testify. At the time of each discharge she had no complaints. Her two hospitalizations had a remarkable correlation to the time scheduled for her to testify. We believe her hospitalization on February 23, 1992, was a deliberate attempt to avoid the Court's February 21, 1992, order that she testify. ii. There is no evidence that Jeanette Spear experienced significant mental or physical problems at times other than these supposed episodes. iii. Petitioners initially refused to have Jeanette Spear be deposed, alleging that it would hurt her health. On August 26, 1991, the Court ordered a psychiatric examination of Jeanette Spear. Petitioners refused to comply with the order and agreed to a deposition. iv. Contrary to representations by her *236 sons, petitioners' counsel, and Dr. Durkin in his April 29, 1991, letter, that health would not permit petitioner to testify, be deposed, or answer interrogatories, she answered deposition questions competently and coherently. v. Her counsel stated, and petitioners represented in discovery, that she lacked relevant information about the case. However, during the deposition she displayed great depth of relevant knowledge. vi. Petitioners often waited until the last minute to announce they would not comply with Court orders or respondent's requests. Jeanette Spear's two hospital admissions were both on the eve of trial. On October 25, 1990, petitioners moved for a continuance of the November 9 trial date. On September 6, 1991, petitioners' counsel informed respondent's counsel Jeanette Spear had an anxiety attack, and canceled a September 7 examination with respondent's psychiatrist. On February 17, 1992, petitioners' counsel notified respondent's counsel that petitioner would not testify at trial. She would have testified on February 21. vii. Petitioners did not inform the Court that Jeanette Spear was released from the hospital, and feeling fine, before the trial was over.
*237 We conclude, as we did at trial, that her refusal to testify was a manipulation, and not a bona fide response to medical problems. b. Sanction Imposed on Petitioners
This Court has the inherent authority to issue orders imposing sanctions as it deems necessary and prudent to achieve the "orderly and expeditious disposition of cases" in its jurisdiction. Link v. Wabash Railroad Co., 370 U.S. 626, 630-631 (1962); Williams v. Commissioner, 92 T.C. 920, 932 (1989) (Court reviewed). For example, the Court has the power to impose sanctions generally to protect its own process from abuse and injustice and to enforce its lawful process. Williams v. Commissioner, supra at 932-933. Under Rule 123(a), if a party fails to proceed as ordered, the Court may hold the party in default and enter a decision against him, or it may impose sanctions it deems appropriate. Marcus v. Commissioner, 70 T.C. 562, 573-574 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). As a sanction for willful failure to comply with our *238 order, we may deem established certain facts, including facts pertaining to the additions to tax for fraud, and use the deemed facts as a basis to find clear and convincing evidence of fraud. Durovic v. Commissioner, 84 T.C. 101, 118 n.9 (1985). As a sanction, the Court ordered that respondent is deemed to have made a prima facie showing of the facts in paragraph seven of the amended answer (paragraph 7), in which respondent alleged facts to support the fraud determination. As a result, respondent is deemed to have met the burden of going forward with evidence to prove the allegations in that paragraph. Respondent requested dismissal as a sanction. However, lesser sanctions than dismissal would better serve the ends of justice in this case. Pickel v. United States, 746 F.2d 176, 182 (3d Cir. 1984); Titus v. Mercedes Benz, 695 F.2d 746, 749-750 (3d Cir. 1982). The sanction we apply here more closely offsets the harm done to respondent by petitioner's conduct than would dismissal. Paragraph 7 of respondent's amended answer provides: 7. FURTHER ANSWERING the petition, and in support *239 of the determination that the underpayment of tax required to be shown on each of the petitioners' income tax returns for the taxable years 1975, 1976 and 1977 is due to fraud, the respondent alleges: (a) Petitioners Leon Spear and Jeanette Spear were married individuals during the years 1975, 1976 and 1977. (b) During the years 1975, 1976 and 1977, petitioners owned and controlled two corporations known as Ezy Parks, Inc. and Tumble Down, Inc. (c) Ezy Parks, Inc. was incorporated in Pennsylvania on December 26, 1956 and at all times was wholly owned and controlled by petitioners. (d) Tumble Down, Inc. was incorporated in Pennsylvania on December 18, 1958 and was at all times wholly owned and controlled by petitioners. (e) During the years 1975, 1976 and 1977, Ezy Parks, Inc. and Tumble Down, Inc. each leased numerous parking lots which they in turn operated and managed [in] a business whereby cash fees were received from customers who parked their cars on the parking lots operated by Ezy Parks, Inc. and Tumble Down, Inc. (f) Ezy Parks II, Inc. was incorporated on November 13, 1975 in Pennsylvania and was at all times wholly owned and controlled by petitioners. (g) Ezy Parks *240 II, Inc. was also engaged in the operation and management of parking lots and received cash fees from customers who parked their cars on these lots. (h) Petitioner Leon Spear supervised and managed the operations of Ezy Parks, Inc., Tumble Down, Inc. and Ezy Parks II, Inc. during the taxable years 1975, 1976 and 1977. (i) The parking lots operated and managed by petitioners through their wholly owned corporations were businesses in which receipts from customers were predominantly in cash. (j) Petitioner Jeannette Spear maintained the business records and handled the banking transactions for Ezy Parks, Inc., Tumble Down, Inc. and Ezy Parks II, Inc. during the taxable years 1975, 1976 and 1977. (k) Petitioners refused to make available to agents of the respondent any records concerning their individual income tax liabilities for the taxable years 1975, 1976 or 1977. (l) Petitioners furnished only incomplete records of their corporations Ezy Parks, Inc., Tumble Down, Inc. and Ezy Parks II, Inc. to agents of the respondent for the taxable years 1975, 1976 and 1977. (m) The three corporations, Ezy Parks, Inc., Tumble Down, Inc. and Ezy Parks II, Inc. which were owned and operated *241 by petitioners generated substantial cash receipts for each of the years 1975, 1976 and 1977. (n) The respondent has determined the petitioners [sic] correct taxable income for the taxable years 1975, 1976 and 1977 on the basis of petitioners (sic) net worth increases and non-deductible expenditures during each of the years 1975, 1976 and 1977. (o) Petitioners did not have available on December 31, 1974 any cash on hand which was not deposited in one of petitioners' bank accounts. (p) There is attached hereto as Exhibit A, which is incorporated herein by reference and made a part hereof, a statement summarizing petitioners net worth increases and non-deductible expenditures for each of the taxable years 1975, 1976 and 1977. (q) On April 7, 1976, petitioners incorporated an entity known as Jay Faunce, Inc. (r) Petitioners owned all of the stock and completely controlled Jay Faunce, Inc. (s) Jay Faunce, Inc. did not actively conduct any business activities at any time. (t) The sole function of Jay Faunce, Inc. was to acquire and hold title to real estate properties acquired by petitioners with unreported income. (u) Petitioners used unreported income to acquire eight real estate *242 properties in their names or the name of a wholly owned nominee corporation. (v) During the taxable years 1976 and 1977, petitioners acquired at least six real estate properties which they concealed by holding title for these properties in the name of their nominee corporation Jay Faunce, Inc. (w) Petitioners deposited unreported income into 34 bank accounts in twelve different banks during the taxable years 1975, 1976 and 1977. (x) Petitioners made investments and expenditures far in excess of the amounts of income they reported on their tax returns for the taxable years 1975, 1976 and 1977. (y) Petitioners' adjusted gross income as determined by petitioners' net worth increases and non-deductible expenses was $ 127,762.80 for 1975, $ 322,213.21 for 1976, and $ 211,173.54 for 1977. (z) Petitioners reported on their respective income tax returns adjusted gross income of only $ 35,902.00 for 1975, $ 45,893.00 for 1976, and $ 63,080.00 for 1977. (aa) Petitioners' correct taxable income was $ 121,494.80 for 1975, $ 314,232.21 for 1976, and $ 206,568.44 for 1977. (ab) Petitioners with fraudulent intent to evade tax substantially understated their income for the taxable years 1975, *243 1976 and 1977. (ac) Petitioners fraudulently with intent to evade tax failed to report $ 93,071.80 of taxable income for 1975, $ 276,309.21 of taxable income for 1976, and $ 148,035.54 of taxable income for 1977. (ad) Petitioners fraudulently with intent to evade tax understated their tax liabilities by $ 51,271.70 on their 1975 income tax return, by $ 157,706.46 on their 1976 income tax return, and by $ 93,536.23 on their 1977 income tax return. (ae) A part of the underpayment of tax required to be shown on the petitioners [sic] income tax returns for their 1975, 1976 and 1977 taxable years is due to fraud.
We deem that respondent has made a prima facie showing of these facts, and has met the burden of going forward as to those allegations. This shifts the burden of going forward with evidence to petitioners to rebut respondent's allegations of fraud. Petitioners did not provide sufficient evidence to overcome these deemed facts. Thus, the allegations stated in paragraph 7 are found as fact as to both petitioners and incorporated by reference in our findings of fact. c. Propriety of Order
Petitioners allege that rule 35 of the Federal Rules of Civil Procedure precludes *244 the mental and physical examination sought by respondent. Rule 35(a) of the Federal Rules of Civil Procedure provides that a court may order a party to submit to a physical or mental examination when the mental or physical condition of a party is in controversy. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made. Fed. R. Civ. P. 35(a). Petitioners argue that Jeanette Spear's mental or physical condition was not in controversy and that respondent has not demonstrated good cause. We disagree. Petitioners placed Jeanette Spear's mental and physical condition in controversy by using it as an excuse to avoid testifying. We conclude that respondent has shown good cause for the order. Respondent has the burden of proving fraud. Jeanette Spear is the most knowledgeable witness of many of the events in issue in this case. She demonstrated a detailed knowledge of relevant facts in her pretrial deposition and an ability to testify without significant problems. Petitioners argue *245 that rule 35 of the Federal Rules of Civil Procedure precludes an examination which will be painful or dangerous to the party, citing Hernandez v. Gulf Oil Corp., 21 Fed. R. Serv. 2d (Callaghan) 1378, 1379 (E.D. Pa. 1976) and Strasser v. Prudential Life Ins. Co., 1 F.R.D. 125 (W.D. Ky. 1939). Petitioners' reliance on these cases is misplaced. In Hernandez the court refused to order the plaintiff to submit to a bone scan involving the injection of a radionuclide followed by x ray. The court found that the results of the bone scan would only be dispositive if the scan showed significant bone metabolic abnormality. In Strasser, the court denied a third examination of the plaintiff where the second examination was not shown to be incomplete due to fault of the defendant. Strasser v. Prudential Life Ins. Co., supra at 126. Petitioners attempted to manipulate the judicial process to deprive respondent of an essential witness. Petitioners do not have the right to elect to use a deposition instead of testimony at trial. We conclude that the order is proper. 2. Respondent's *246 Net Worth Computation Is Not Arbitrary
Respondent used the net worth method to determine petitioners' income for the years in issue. Under the net worth method, income is computed by determining a taxpayer's net worth at the beginning and end of a year. The difference between the two amounts is the increase in net worth. This difference is increased by adding nondeductible expenditures, including living expenses, and by subtracting gifts, inheritances, loans, and the like. Holland v. United States, 348 U.S. 121, 125 (1954). An increase in a taxpayer's net worth, plus his nondeductible expenditures, less nontaxable receipts, may be considered taxable income. Id.
In a net worth case, respondent must: (1) Establish, with reasonable certainty, an opening net worth; and (2) either (a) show a likely income source, or (b) negate possible nontaxable income sources. Holland v. United States, supra at 132-138; Smith v. Commissioner, 91 T.C. 1049, 1059 (1988), affd. 926 F.2d 1470 (6th Cir. 1991). Respondent used zero as the opening (December 31, 1974) cash *247 on hand amount. Petitioners allege that respondent's net worth determination is arbitrary and excessive because respondent: (1) Omitted from the computation of cash on hand, (a) a $ 380,000 cash gift Abe Spear purportedly made to Leon Spear in 1957, and (b) various loan receivables; (2) failed to establish a likely source of income; and (3) failed to negate all nontaxable sources of income. As discussed below, we conclude that there was no gift or loans as petitioners claim. Petitioners alternatively argue that if respondent is correct that they skimmed income, then respondent failed to show that they skimmed only during the years in issue. It is true that we have no reason to think skimming suddenly started on January 1, 1975. However, petitioners provide no basis for us to decide how much cash they had on December 31, 1974. Accordingly, we have no grounds for changing respondent's net worth calculation. a. Abe Spear Did Not Give Leon Spear a $ 380,000 Cash Gift in 1957
Petitioners allege that Abe Spear, Leon Spear's father, gave Leon Spear $ 380,000 in cash shortly before Abe Spear died on August 25, 1957. The only evidence for this claim is the testimony by petitioners *248 and their son Robert Spear. As discussed below, their testimony was unconvincing and implausible. Petitioners argue that Abe Spear gave the money to Leon Spear and not to his brothers or sisters because he had a special relationship with Leon Spear and that Leon Spear was Abe Spear's favorite child. Petitioners also assert that Abe Spear asked Leon Spear not to tell anyone, particularly his siblings, about the gift. Other than petitioners' testimony, there is nothing to suggest Abe Spear favored Leon Spear or engaged in this subterfuge solely for Leon Spear, and there is much to show he had amicable dealings with his other children. For example, Abe Spear's will names Morris Spear, and Nathan D. Zibelman, Leon Spear's brother and brother-in-law, not Leon Spear, as the executors of his will. We conclude that Abe Spear did not have the means to make the claimed gift. Abe Spear borrowed money from his children. He had mortgages on many of his properties when he died. He was delinquent on bill payments when he died, including real estate taxes and water and sewer costs. Abe Spear's reported gross estate at his death was about $ 83,000, including $ 3,715 in cash. Abe Spear had *249 some of his jewelry in a pawn shop when he died. Petitioners argue that this does not indicate lack of money, and that it is equally likely that a husband would not want to keep his wife's jewelry after her death. We disagree. It seems unlikely that Abe Spear would give his son $ 380,000 and place jewelry in a pawn shop. Both Leon and Sidney Spear, Abe Spear's sons, filed exceptions to his will. We believe it is unlikely that Leon Spear would allege that items were missing from the Estate of Abe Spear if he had just received $ 380,000 in cash from his father that was concealed from his siblings because this would attract the scrutiny of the Court and his family. Robert Spear testified that Abe Spear owned a substantial amount of real property when he died. However, Robert Spear was only about 5 years old when Abe Spear died. The properties were encumbered and do not suggest Abe Spear had $ 380,000 in cash. Borrowing money can indicate the absence of a large accumulation of cash. Thomas v. Commissioner, 223 F.2d 83, 88 (6th Cir. 1955). Petitioners had mortgages on their real estate. From 1957 to 1973, they made monthly mortgage payments on *250 their house on Magee Street. In 1973, petitioners obtained a mortgage of $ 18,600 when they purchased their home at 7601 Leonard Street. Jeanette Spear prepared a mortgage application on December 27, 1972, to buy their home at 7601 Leonard Street. She did not list the cash hoard under the "cash accounts" or "other important assets" items on the financial statement in the mortgage application. Petitioners had no record of the amount of the cash hoard, and did not know how much cash they had in safe deposit boxes. Petitioners first claimed they had a cash hoard at petitioners' criminal trial in January 1983 when Leon Spear testified about the alleged cash gift from his father. No other witness testified about the alleged gift. Jeanette Spear did not testify at the criminal trial. Petitioners and their representatives could have claimed the cash gift earlier, such as during the initial interview with revenue agent Michael McGuckin in 1977, or during the audit. Petitioners' failure to claim a cash hoard earlier undermines the credibility of their claim. Petitioners claimed that they kept the money out of bank accounts because they distrusted banks. However, this claim is not *251 credible because petitioners used banks extensively. Petitioners claim that in 1957 Abe Spear gave Leon Spear some currency issued from 1928 to 1950, and they argue that shows there was a cash hoard. The currency was placed into evidence at the criminal trial. These bills have total face value of $ 2,700 or less. This does not lead us to conclude that Abe gave Leon $ 380,000 in cash. Petitioners argue that their many trips into their safe deposit boxes are evidence of their cash hoard. We think trips to the safe deposit boxes are more likely to result from petitioners' cash business. Petitioners assert that Leon Spear's brothers blew up Abe Spears' safe the day Abe Spear died. Petitioners argue that this shows that they believed that Abe Spear had hidden money and that Abe Spear made a cash gift to Leon Spear shortly before Abe Spear's death. We disagree. The only evidence about opening the safe is Leon's testimony at his criminal trial. Even if the safe were opened, it does not prove that those who opened the safe believed that it contained a cash hoard. Based on the foregoing factors, we are not convinced petitioners had the claimed $ 380,000 cash hoard. b. Loans *252 Receivable
Petitioners claim they made loans to their corporations before 1975 from the $ 380,000 cash gift from Abe Spear, which they used to renovate parking lots. Petitioners' corporations wrote many checks to petitioners from 1975 to 1977, which petitioners argue were to repay those loans. Petitioners offered no loan agreements or other documentation of the loans except for some checks with memos indicating loan repayment. The loans were not reflected on the corporate books and records. Except for testimony by Jeanette Spear, there is no evidence that petitioners ever told their accountants about these loans. Jeanette Spear testified in detail in her deposition in this case about the purported loans. However, during her earlier March 1988 deposition in petitioners' lawsuit against Brown, when asked whether she recalled a specific incident of lending money to the corporation, she testified, "I don't recall." To show that funds received were loan repayments, petitioners must show there were bona fide loans. This depends on all of the facts and circumstances, and generally no one fact is determinative. John Kelley Co. v. Commissioner, 326 U.S. 521 (1946). *253 In deciding this issue, we consider the following factors: (1) Whether a note or other evidence of indebtedness exists and whether interest is charged, Clark v. Commissioner, 18 T.C. 780, 783 (1952), affd. 205 F.2d 353 (2d Cir. 1953); (2) whether any security or collateral is requested, Zimmerman v. United States, 318 F.2d 611, 613 (9th Cir. 1963); (3) whether the parties' records, if any, reflect the transaction as a loan, see Clark v. Commissioner, supra at 783; (4) whether any repayments have been made, Estate of Ames v. Commissioner, a Memorandum Opinion of this Court dated Feb. 7, 1946; and (5) a fixed repayment date, Frierdich v Commissioner, T.C. Memo. 1989-393, affd. 925 F.2d. 180 (7th Cir. 1991). Petitioners produced no notes to substantiate their claim that loans were made, no evidence that interest was charged, that collateral was requested, or that repayment dates were set. The only records are notations on a few check stubs with related entries on the books and records of petitioners' *254 corporations. Petitioners' loan repayment claim assumes they received a large cash gift from Abe Spear from which to make the loans. We have found they did not. Petitioners have shown no other source of funds for the claimed loans. We conclude that petitioners did not make the claimed loans. 3. Likely Source of Income
Respondent contends that petitioners' likely sources of income include skimming of gross receipts from their parking lot corporations, diversion of corporate funds, proceeds from the sale of automobiles, cashing employee checks with corporate cash and depositing the checks in petitioners' personal accounts, and commissions from vending machine sales. a. Philadelphia Parking Lot Regulations Did Not Prevent Skimming From Parking Lots
Petitioners argue that they could not skim cash from parking lot receipts because of City parking tax enforcement procedures. Petitioners assert that Philadelphia parking lot regulations required petitioners to sequence and record the tickets and to place tickets on each car making it impossible to underreport parking lot income to the City without being discovered. Petitioners point out that the City periodically audited *255 parking lot returns and checked the lots to ensure compliance with regulations. We are not convinced that the City's controls were as tight as petitioners contend. The City only made seven investigation reports which covered 3 of the corporations' 13 parking lots during the 3 years in issue. There is no record of any investigation report in 1975. The City issued only one letter which authorized EZ II to destroy tickets for two parking lots for a 6-month period in 1976. Petitioners argue that the authority to destroy tickets was also the authority to destroy the settlement sheets. However, the letter authorizing ticket destruction mentions only tickets and not settlement sheets. Petitioners point to no authority for their position. [2]
*256 Tickets being placed on the cars, as recorded and verified by the City investigator, were sometimes inconsistent with that being reported on the monthly parking lot returns. For example, the September 20, 1976, investigative report for the 811 Race Street lot shows the opening ticket number for the day was 5,411 and the ticket number at the time of the investigator's visit was 5,679. Petitioners reported on their City parking lot return for this lot for September 1976, that the opening ticket number for the month was 11,002 and the closing ticket number for the month was 22,112. Similarly, on the November 16, 1976, investigative report for this lot, the opening ticket number for the day was 22,578 and the ticket number during the investigator's visit was 22,832. Petitioners reported on their City parking lot return for this lot for November 1976, that the opening white ticket number for the month was 3,511 and the closing white ticket number for the month was 11,523 and the opening green ticket number for the month was 1 and the closing green ticket for the month was 3,102. b. Deposits in Petitioners' Personal Bank Accounts
Petitioners made cash deposits in their personal *257 savings or checking accounts as follows: 22 deposits in 1975 totaling $ 27,983; 46 in 1976 totaling $ 140,214.85; and 13 in 1977 totaling $ 83,061.50. Petitioners did not report these deposits on their Federal income tax returns. Without any credible explanation in the record to the contrary, these cash deposits support respondent's determination that skimming from the parking lots was a likely source of petitioners' increase in net worth. Petitioners' corporations paid to, for, or on behalf of petitioners at least $ 75,387.50 in 1975, $ 95,197.58 in 1976, and $ 64,612.31 in 1977. Petitioners did not report these amounts as gross income on their tax returns for those years. These amounts are corporate diversions and are taxable as ordinary income to petitioners. These payments represent specific likely sources for the increases in net worth determined by respondent. c. Sinclair's Report
Petitioners argue that George Sinclair's (Sinclair) expert report and testimony proves that petitioners could not have skimmed from their parking lots because the lots could not have produced sufficient gross income. Sinclair is president of Keystone Appraisal Co., a member of the American *258 Institute of Real Estate Appraisers, and a member of the American Society of Appraisers, College of Fellows. Petitioners argue that Sinclair is a qualified expert and that his opinion is correct. We disagree with Sinclair's opinion. Sinclair's report purports to show the maximum that petitioners could have earned from the lots during the years in issue. The following chart compares: (1) Parking lot gross income reported by petitioners [3] to the City and estimated by Sinclair; and (2) parking lot gross receipts reported by petitioners' corporations to respondent. Sinclair's Sinclair's maximum
estimated
City Federal
Year
gross
gross
return return 1975
$ 459,410  $ 409,869  $ 442,946  $ 305,015  1976
625,745
553,867
567,601
462,448
1977
651,318
490,219
464,581
541,005
$ 1,736,473
$ 1,453,955
$ 1,475,128
$ 1,308,468
Sinclair's methodology has numerous *259 flaws, such as: i. Lot capacity. Sinclair's estimate of lot capacity was based on checking with L & I and visiting the lots in 1982, not in the years at issue. He did not take into account the increase of about 200 or more spaces available to EZ after July 31, 1976, on Spring Street between 15th and 16th Street (160 by 400 feet). ii. Maximum Daily Capacity. Sinclair estimated the maximum daily capacity by estimating the number of daily, hourly, evening, and monthly parkers. He did not rely on the Philadelphia parking lot returns. His estimates were not consistent with the amounts reported by petitioners. Sinclair estimated that 58,086 cars could be parked in Lot A in 1976, and that 55,182 cars would actually park. The actual number of cars reported by petitioners to the City was 58,194 cars. Sinclair concluded that 111,200 cars could have parked in Lot C in 1975 and 1976. Petitioners reported to the City that 117,879 parked in that lot in 1975 and 121,334 cars in 1976. Another example is the Southwest corner of Broad and Vine Streets lot (Lot J) for 1975. Sinclair projected that 80,364 cars could have parked in 1975, and he estimated that 76,346 cars actually *260 parked there. Petitioners reported to the City that 83,065 cars parked in Lot J in 1975. iii. Over Parking. Sinclair assumed that occasionally a lot may be one or two cars over capacity. During each of seven inspections by the City, petitioners' lots were over parked, in one instance by 279 cars. His report says he compensated for over parking in the turnover rate he used, but we believe Sinclair understated the degree of over parking. iv. Number of Days of Operation. Sinclair incorrectly assumed none of the lots operated 7 days per week. For example, the 13th and Vine Street lots were occasionally in operation on Sundays, although Sinclair assumed they did not operate on Sundays. Sinclair assumed the 811-841 Race Street lot operated 5 days a week with no evening parking. However, it operated 7 days a week and in the evenings. For the 1414-1420 Spruce Street and 314 S. Broad Street lots, Sinclair assumed they operated 6 days while in fact they operated 7 days per week. He also underestimated the rate charged for evening parking at those lots. v. Rates. Different rates may apply to hourly, daily, evening, and monthly parking (chargeable rate). Sinclair *261 underestimated chargeable rates for some of the lots. For example, Sinclair understated rates charged for the 13th and Vine Street lots by not allowing for Sunday or evening parking. Sinclair incorrectly used $ 1.50 as the rate for daily parking at the 13th and Vine Street lots for 1975 and 1976 and 75 cents for hourly parking through March 24, 1976, when petitioners were charging $ 1.50 for the early bird special and $ 2 for daily parking. Sinclair also did not include evening parking which was $ 1 after 5 p.m. On May 25, 1977, petitioners raised the daily parking rate from $ 2 to $ 2.25. Sinclair inaccurately used $ 1.75 for daily parking for the entire year. vi. Percentage of Occupancy. Sinclair based his assumption for percentage of occupancy on his claimed knowledge of each lot. He was not at any of the lots from 1975 to 1977. Sinclair reduced the occupancy rate of the 811 Race Street lot because he erroneously assumed it was not paved before August 1977. He also assumed the capacity of the lot was 210 cars, while in fact it was more than 240 cars from at least August 1977.
Sinclair erroneously reduced the percentage of occupancy on the 15th and Vine/Summer Streets *262 lot due to construction on Hahnemann Hospital, and he understated parking rates charged at that lot after July 30, 1977. These flaws led to inaccuracies in Sinclair's estimate of maximum gross receipts. We believe Sinclair's estimate to be significantly understated. Therefore, Sinclair's report does not convince us that petitioners' parking lots were incapable of producing sufficient gross income for them to skim unreported income as determined by respondent. d. Bolden's Report
Petitioners argue that Steve Bolden's (Bolden) testimony and report prove that they could not have skimmed from the parking lots. Bolden, a certified public accountant, testified that lot gross income net of taxes reported on petitioners' corporations' Federal tax returns from 1975 through 1977 ($ 1.337 million) almost equaled the amount deposited in the corporate bank accounts during that period ($ 1,308,000). We disagree with his conclusion that all receipts were reported. Some of Bolden's schedule was based on numbers which were not in the record. Finally, we do not accept Bolden's analysis. To do so one would have to believe, as Bolden's analysis suggests, that petitioners substantially underreported *263 the gross income for EZ and TD in 1975 and 1976 and substantially overreported the gross income for EZ II in 1976 and EZ and EZ II in 1977. e. Corporate Diversions
Respondent contends that examples of corporate diversions for personal benefit show likely sources of income. Petitioners counter with several arguments. First, they contend that specific acts are impermissibly combined with an indirect method to determine a deficiency. Second, petitioners argue that respondent has the burden of proof with respect to specific items. Third, petitioners alternatively argue that the payments and deposits were proper corporate expenditures and not corporate diversions for their benefit. Finally, petitioners contend that if there are any improper diversions, they are the fault of Brown and others, and not petitioners' fault. Petitioners argue that respondent cannot use both the net worth and specific adjustments methods in the same case, citing Adler v. Commissioner, T.C. Memo. 1968-100, affd. 422 F.2d 63 (6th Cir. 1970), and Prizep v. Commissioner, T.C. Memo. 1959-56. In Prizep, the Commissioner *264 determined the deficiency from specific items using the bank deposits method. Fraud was also alleged. Alternatively, the Commissioner alleged that the net worth method should be used if the Court held that the specific items assertions were incorrect. The net worth method resulted in higher deficiencies. The Court noted that when the amount of income under the two methods differs, both methods could not be used to decide the deficiency. The Court used the bank deposits method, which was the method stated in the notice of deficiency. Here, respondent determined deficiencies solely by using the net worth method. Respondent does not alternatively allege a deficiency determination using another method, such as a specific items method. Thus, there are no conflicting methods resulting in different deficiencies. Moreover, the specific item assertions were not used to determine the deficiency, but rather to show likely sources of income and to support the addition to tax for fraud. Thus, petitioners' reliance on Prizep, and for the same reasons, Adler, is misplaced. Petitioners argue that respondent made these specific assertions more than 2 years after respondent issued *265 the notice of deficiency, and, therefore, respondent bears the burden of proof as to the specific assertions under Rule 142(a). We agree that respondent bears the burden of proof with respect to fraud, but not with respect to the deficiency. Respondent determined the deficiencies in the notice of deficiency in this case using the net worth method. These specific items are not a new issue or theory under Rule 142(a). Rather, they are examples of likely sources of income. Respondent has the burden of proving fraud and uses specific assertions as indicia of fraud. Thus, the specific items are not new issues for which respondent has the burden of proof, but respondent bears the burden of proof as to fraud. Petitioners argue that all specific items raised by respondent are traceable and proper as loan repayments, or other proper corporate expenditures. We disagree for reasons discussed above under loan repayments and the following: Petitioners received funds from the corporations in three ways: (1) They received payments from the corporations which were not recorded on corporate records; (2) they received payments which were recorded, but misclassified by the corporation and not *266 reported as income by petitioners; and (3) the corporation paid some of petitioners' personal expenses. All of these provided income to petitioners. The first category involves corporate checks made payable to petitioners or withdrawals from corporate accounts which were deposited in their personal accounts or used to purchase certificates of deposit, but which were not recorded on the books and records of the corporations. The second category involves corporate payments to petitioners which were listed on the corporate books and records, although many of the checks were misclassified and petitioners did not report these amounts as salary or dividends. Petitioners argue that Brown and Wolf are responsible for any misclassifying and that the amounts were actually loan repayments. We disagree. Petitioners point out discrepancies between the City parking lot returns and their Federal returns, and blame Brown for the discrepancies. They allege that they gave Brown copies of the City parking lot returns prepared by Jeanette Spear. However, the stipulated memorandum of Brown's interview with Internal Revenue Service agents in 1978 states that he did not have them. We conclude that *267 petitioners did not give Brown copies of them. Brown had the cash receipts deposits for 1976 for EZ when he prepared the corporate Federal income tax return. Petitioners made the deposits into the corporate accounts. Their Federal income tax returns were prepared based on those deposits. Thus, it appears that Jeanette Spear, by withholding the City parking lot returns from Brown, intentionally kept Brown from understanding their true income, and that petitioners are significantly to blame for the discrepancy. Petitioners' attempts to blame Wolf are unpersuasive. Wolf did not classify checks. She only did what Jeanette Spear told her to do, which was to record in a journal check stubs that had already been classified by someone else. The third category involves corporate checks which petitioners used to pay their or their sons' personal expenses. They did not record many of these checks in the books and records of the corporations, and did not report any of these amounts as income on their individual returns. Petitioners argue that some of the expenses were legitimate corporate expenses. For example, Robert and Jeanette Spear testified that the one bedroom apartment was *268 actually a corporate office. We believe that it was Robert Spear's residence. The lease was in Robert Spear's name, and the notations on the rental checks were for Robert Spear's apartment. Checks were posted in the rent column of the cash disbursement journal for Robert Spear. Wolf, a credible witness and former employee who would appear to have known of the claimed office, had no knowledge of it. Petitioners sometimes cashed their employee pay checks using corporate cash and deposited the checks in petitioners' personal bank accounts. This conduct is another likely source of the net worth increases. Petitioners have not convinced us that these corporate diversions were not for their personal benefit. Respondent has shown likely sources of income. 4. Respondent Adequately Investigated Leads
Respondent must investigate all leads presented by the taxpayer which are reasonably susceptible of being checked. Holland v. United States, 348 U.S. 121, 135-136 (1954). Petitioners did not offer any information which respondent failed to investigate. A taxpayer cannot complain about the sufficiency of an investigation where he has offered no *269 leads or leads not reasonably susceptible of being checked. United States v. Penosi, 452 F.2d 217, 220 (5th Cir. 1971); Blackwell v. United States, 244 F.2d 423, 429 (8th Cir. 1957). We conclude that leads provided by petitioners were not reasonably susceptible of being checked any more than respondent did; thus respondent adequately investigated leads. 5. Addition To Tax for Fraud Under Section 6653(b)
Respondent determined that petitioners Leon and Jeannette Spear are liable for the fraud additions to tax under section 6653(b). Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). First, respondent must prove the existence of an underpayment. Parks v. Commissioner, 94 T.C. 654, 660 (1990). Respondent may not rely upon the taxpayer's failure to carry the burden of proof as to the underlying deficiency. Parks v. Commissioner, supra at 660-661; Petzholdt v. Commissioner, 92 T.C. 661, 700 (1989); Estate of Beck v. Commissioner, 56 T.C. 297, 363 (1971). *270 Second, respondent must show that the taxpayer intended to evade taxes by conduct intended to conceal, mislead, or otherwise prevent tax collection. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Parks v. Commissioner, supra at 661; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). On February 24, 1992, the Court imposed sanctions on petitioners because Jeanette Spear violated an order of the Court by unreasonably refusing to testify at trial. The Court ordered that respondent is deemed to have made a prima facie showing that the facts in paragraph seven of the amended answer (paragraph 7) are established. Petitioners did not convince us that any of the statements of facts in paragraph 7 are wrong. As discussed below, we conclude the facts stated in paragraph 7 and the entire record in this case clearly and convincingly show that Leon and Jeanette Spear are liable for fraud for each year in issue. (a) Underpayment
Respondent may prove an underpayment by proving a likely source of the unreported income, Holland v. United States, supra at 137-138; *271 Parks v. Commissioner, supra at 661, or where the taxpayer alleges a nontaxable source, by disproving the specific nontaxable source so alleged. United States v. Massei, 355 U.S. 595 (1958). The Commissioner may carry the burden of proving fraud by clear and convincing evidence by relying on facts deemed established by reason of a Court order. Durovic v. Commissioner, 84 T.C. 101, 118 (1985); Rechtzigel v. Commissioner, 79 T.C. 132, 139-143 (1982), affd. 703 F.2d 1063 (8th Cir. 1983). Petitioners allege that City parking lot regulations precluded the possibility of an underpayment from skimming, and that they complied with the regulations and filed accurate parking lot returns. We disagree. Petitioners did not comply with the regulations. Instead, petitioners reported manipulated information on the parking lot returns. For example, the City investigation reports prepared by City employees, which we believe to be credible and accurate, showed ticket numbers that differed from those that petitioners reported for the same time *272 period on their parking lot returns. The only explanation for the discrepancy could be the use of a different sequence of tickets. Petitioners did not report the use of a different sequence of numbers. We are confident that petitioners had a good system for ensuring that their employees gave them all of the parking lot receipts. This would have been documented in the daily settlement sheets. However, petitioners destroyed those documents. Thus, they are not available to be reconciled with the parking lot returns. The parking lot returns also differed from the Federal income tax returns. Petitioners argue that respondent has determined unreported income for the wrong years. That theory assumes that petitioners honestly reported their income during the years before the Court, but understated their income and tax liabilities in earlier years. We reject that theory. We believe that petitioners failed to report income from the years in issue and may have done so for other years. Petitioners have not provided any basis for us to decide the amounts, if any, they skimmed in prior years. Respondent has shown a likely source of unreported income from petitioners' parking lot business. *273 As discussed above, we have rejected petitioners' claim that their nontaxable sources were the cash hoard and loan repayments. Thus, we conclude that respondent has proven an underpayment for purposes of section 6653(b) for 1975, 1976, and 1977 by clear and convincing evidence. (b) Fraudulent Intent
Respondent must prove by clear and convincing evidence that petitioners had the requisite fraudulent intent. Parks v. Commissioner, supra at 664. For purposes of section 6653(b), fraud means "actual, intentional wrongdoing," Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939); or the intentional commission of an act or acts for the specific purpose of evading a tax believed to be owing. Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. Fraud may be proven by circumstantial evidence (including the implausibility of the taxpayer's explanations, Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion *274 of this Court dated Mar. 14, 1951; Malandro v. Commissioner, T.C. Memo. 1989-135) because direct evidence of the taxpayer's intent is rarely available. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). Petitioners did not satisfactorily explain their large understatements. We have rejected petitioners' cash hoard and loan repayment claims. We do not believe petitioners' explanation that the source of the claimed cash hoard was a gift from Abe Spear. The courts have developed a number of objective indicators, or "badges" of fraud. Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Examples of the badges of fraud present in this case are: (1) Implausible or inconsistent explanations of behavior, (2) large understatements of income, (3) inadequate records, (4) failure to supply complete information to return preparer, (5) diversion of corporate funds, and (6) dealings in *275 cash. Bradford v. Commissioner, supra at 307-308. Petitioners' testimony about the cash hoard is not believable and is uncorroborated by any documents. It appears to have been contrived as an attempt to avoid taxes. For example, petitioners relied on Robert Spear's testimony that he specifically remembered that a photograph of the original 15th and Vine/Summer Streets lots, was taken in 1977. However, respondent impeached Robert Spear's testimony by showing that the photograph was taken after 1980 because one of the buildings in the photograph was constructed in 1980. Large unexplained discrepancies between petitioners' net income and the net income reported on their tax returns are evidence of fraud. Stone v. Commissioner, 56 T.C. 213, 224 (1971). Those discrepancies are present here. Petitioners had inadequate records. They did not maintain any records of their alleged cash hoard. A taxpayer's failure to maintain accurate records supports a finding of fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172; Reaves v. Commissioner, 295 F.2d 336, 338 (5th Cir. 1961), *276 affg. 31 T.C. 690 (1958). The destroying of business documents can indicate an intent to conceal income. Schwarzkopf v. Commissioner, 246 F.2d 731, 734 (3d Cir. 1957), affg. T.C. Memo. 1956-155. A taxpayer's failure to give complete information to his or her tax return preparer about the taxpayer's income and expenses is a badge of fraud. Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986), affg. per curiam T.C. Memo. 1985-63. Petitioners did not give Brown all of the necessary records. The intent to conceal or mislead may be inferred from a pattern of conduct. See Spies v. United States, 317 U.S. 492, 499 (1943). A pattern of consistent underreporting of income for a number of years, especially when accompanied by other circumstances showing intent to conceal, is strong evidence of fraud. Holland v. United States, 348 U.S. at 137-139; Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memo. 1970-37; *277 Foster v. Commissioner, 391 F.2d 727, 733 (4th Cir. 1968), affg. on this issue T.C. Memo. 1965-246. Petitioners consistently underreported their income for the 3 years in issue. A taxpayer's diversion of corporate funds to his own use, coupled with his failure to record them in the corporate books and records, is evidence of fraud. Solomon v. Commissioner, 732 F.2d 1459, 1460-1461 (6th Cir. 1984), affg. T.C. Memo. 1982-603; United States v. Brill, 270 F.2d 525, 527 (3d Cir. 1959). Petitioners diverted substantial funds from their corporations for their personal benefit. Petitioners had extensive dealings in currency which can indicate fraud. Bradford v. Commissioner, supra at 308. Petitioners' dealings in cash gave them ample opportunity to skim unreported income from their parking lot business. We believe they took advantage of that opportunity. A taxpayer's training, business experience, and knowledge of income tax laws are relevant to the determination of fraud. Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), *278 affg. T.C. Memo. 1970-274; Drobny v. Commissioner, 86 T.C. 1326, 1349 (1986). Petitioners attempted to portray Jeanette Spear as unknowledgeable. To the contrary, she was very knowledgeable and involved in the business and recordkeeping. We believe her to be as involved and as culpable as Leon Spear. Petitioners blame mistakes on their returns on Brown. However, petitioners shrewdly gave Brown only cash deposit information but not daily settlement sheets, checks, or copies of City parking lot returns. We are not persuaded that Brown caused petitioners' tax problems. Rather, we believe that Leon and Jeanette Spear knew how much they received from the parking lots and that they decided how much to report to the Internal Revenue Service. Petitioners allege that they reported all gross receipts and properly filed City parking lot returns. However, the clear inconsistencies of the ticket numbers recorded by City employees during spot checks of the parking lots and the parking lot returns prepared by Jeanette Spear cause us to disbelieve petitioners' claim. Petitioners allege that Adrienne Wolf was responsible for their *279 corporations' books. We disagree. Adrienne Wolf was a credible witness. When she was a high school student, she did routine bookkeeping as directed by Jeanette Spear. Jeanette Spear was responsible for characterizing the purpose of all corporate checks in 1975, 1976, and 1977, and for posting the figures to the proper columns. Fraud is not imputed from one spouse to another; in the case of a joint tax return, respondent must prove fraud as to each spouse charged with liability for the addition to tax. Section 6653(b)(3); Hicks Co. v. Commissioner, 56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Stone v. Commissioner, supra at 227-228. We conclude that respondent has proven fraud by clear and convincing evidence for each petitioner. Accordingly, we hold petitioners are each liable for the additions to tax for fraud under section 6653(b) for 1975, 1976, and 1977. 6. The Statute of Limitations
Petitioners timely filed their Federal income tax returns for 1975, 1976, and 1977. Respondent is generally required to assess tax within 3 years of the date the return is *280 filed. Sec. 6501. There is no limitation period to assess tax if the Internal Revenue Service proves fraud. Sec. 6501(c)(1). In light of our holding that respondent has proved fraud under section 6653(b) for both petitioners, we hold that assessment and collection of the deficiencies and additions to tax asserted against petitioners are not barred by the statute of limitations. Accordingly, we need not reach respondent's alternative substantial omission theory under section 6501(e) for 1976 and 1977. 7. Evidentiary Issues
Petitioners offered three documents into evidence which we excluded as hearsay. Petitioners argue on brief that these documents should have been admitted into evidence. We note that even if they were admitted, they would not change our conclusions discussed above. Rule references in this section are to the Federal Rules of Evidence. a. Deposition of J. Gilbert Brown in Spear v. Brown
Petitioners offered into evidence Brown's deposition from Leon Spear's malpractice suit against Brown. Respondent objected on hearsay grounds. Petitioners contend it is admissible under rule 803(24) of the Federal Rules of Evidence.Under rule 803(24), the *281 Court may admit hearsay which is not covered by another exception in rule 803 if it has equivalent guarantees of trustworthiness and if: (1) The statement is offered as evidence of a material fact; (2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (3) the general purposes of the Federal Rules of Evidence and the interests of justice will be served by admission of the statement into evidence. In addition, the proponent must notify the adverse party sufficiently in advance of trial to provide fair opportunity to prepare to meet it. Rule 803(24) was intended to be used only in exceptional circumstances. United States v. Heyward, 729 F.2d 297, 299-300 (4th Cir. 1984); Robinson v. Shapiro, 646 F.2d 734, 742 (2d Cir. 1981); Goldsmith v. Commissioner, 86 T.C. 1134, 1140 (1986). Petitioners have not shown that the deposition is more probative than testimony in this case by Brown or by Jeanette Spear. The proponent must also show that they provided proper notice under rule 803(24) of the *282 Federal Rules of Evidence. Petitioners have not made that showing. They do not even allege that they provided respondent with proper notice. Rather, petitioners assert that respondent was not prejudiced because respondent may have had the transcript for at least a year before trial. We conclude that the Brown deposition is inadmissible under rule 803(24) of the Federal Rules of Evidence.
b. Deposition of Leon Spear from Spear v. Brown
Petitioners offered into evidence the transcript of Leon Spear's deposition from his malpractice suit against Brown, to show Brown's culpability for petitioners' tax problems. Respondent objected to the document as hearsay. Petitioners argue that it is admissible under Rule 804(b)(1) or (5) of the Federal Rules of Evidence.
Rule 804(b)(1) of the Federal Rules of Evidence provides that former testimony is not excluded as hearsay if the declarant is unavailable as a witness, if the deposition is taken in compliance with law in the course of another proceeding and if the party against whom the testimony is offered or a predecessor in interest had an opportunity and similar motive to develop the testimony by examination. Leon Spear was deceased *283 at the time of the trial in this case and therefore was unavailable. The issue in the prior case was whether Brown's conduct was malpractice, not petitioners' tax liability. Even where the facts may have been the same, the different issues can result in a finding that Brown was not a predecessor in interest. See United States v. Wingate, 520 F.2d 309, 316 (2d Cir. 1975) (testimony from suppression hearing not admissible in trial, even though the testimony covered the same events, because the issue at the suppression hearing was whether a confession was voluntary, and not whether the defendant was guilty or innocent); Peterson v. United States, 344 F.2d 419, 422-425 (5th Cir. 1965) (where existence of criminal conspiracy not at issue in first two trials, former testimony of a witness may not be offered to prove a conspiracy in the third trial). Rule 804(b)(5) of the Federal Rules of Evidence provides a hearsay exception identical to rule 803(24), discussed above, except rule 804(b)(5) applies if the declarant is unavailable. Like rule 803(24), rule 804(b)(5) is to be used only in exceptional circumstances. In re Corrugated Container Antitrust Litigation, 756 F.2d 411, 415 (5th Cir. 1985); *284 Goldsmith v. Commissioner, supra at 1140. Like rule 803(24), rule 804(b)(5) requires that the statement be more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts and that the general purposes of the Federal Rules of Evidence and the interests of justice will be served by admission of the statement into evidence. We are not convinced that Leon Spear's deposition in the law suit against Brown is more probative than testimony by Jeanette Spear. Jeanette Spear was responsible for the corporations' books and was the link between petitioners' business and Brown. Her testimony would have been more probative than Leon Spear's deposition. It is not in the interest of justice to admit this deposition into evidence when petitioners have improperly refused to provide more probative trial testimony by Jeanette Spear. Moreover, petitioners have not shown that they gave respondent proper notice as required by rule 804(b)(5) of the Federal Rules of Evidence. Consequently, we hold that Leon Spear's deposition in Spear v. Brown was properly excluded as inadmissible hearsay in *285 this case. c. Testimony of Robert Wilson in United States v. Spear
Petitioners assert that Robert Wilson's prior trial testimony from Leon Spear's criminal case should not have been excluded as hearsay because it qualifies for hearsay exceptions under rules 804(b)(1), (5) or 803(24) of the Federal Rules of Evidence, discussed above. Rule 804 applies only if the declarant is unavailable. A declarant is unavailable if he or she is absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance by process or other reasonable means. Fed. R. Evid. 804(a)(5). Generally, the proponent has the burden of showing unavailability of a witness. Complaint of Bankers Trust Co., 752 F.2d 874, 887-888 (3d Cir. 1984). Petitioners offered an affidavit of petitioners' process server which states that he made one attempt to serve a subpoena on Robert Wilson at 4531 Larchwood Avenue on February 20, 1992, but could not because the witness had moved and the house was empty. However, respondent's paralegal contacted Wilson by telephone at the number listed in petitioners' witness list on January 23, 1992, and during *286 the week before February 20, 1992. Since Wilson was available at his normal phone number the week before February 20, we are not convinced that he was unavailable. Petitioners do not claim, and there is no evidence, that they informed respondent that they would offer this document at trial as required by rules 803(24) and 804(b)(5). It was not included in the documents sent to the Court in compliance with the Court's pretrial order. Rather, petitioners' counsel stated that he thought respondent would call Wilson as a witness and petitioners could question him at that time, and thus no advance notice was needed. Petitioners did not list Wilson as one of their witnesses. Respondent was not a party to the malpractice lawsuit. We conclude that the transcript is not admissible under either exception. To reflect the foregoing and concessions, Decisions will be entered under Rule 155 in docket No. 3276-87 and for petitioners in docket Nos. 21480-90 and 21481-90. Footnotes
1. Cases of the following petitioners are consolidated herewith: Estate of Abe Spear, Deceased, Morris Spear, Executor, docket No. 21480-90; Estate of Leon Spear, Deceased, Jeanette Spear, Administrator, Robert Spear, Administrator, and Harvey Spear, Administrator, docket No. 21481-90. See Spear v. Commissioner↩, 91 T.C. 984 (1988) (Court denied taxpayers' motion for partial summary judgment on estoppel grounds).
2. The City's parking lot regulations provide: Section 404. Preservation of Records; Lost or Destroyed Records. All books, records, daily record sheets and ticket stubs shall be retained by the operator of a parking lot or lots for a period of six (6) years subsequent to the year of the transaction. This regulation will apply in all cases unless advance written permission to destroy such data has been obtained from the Revenue Commissioner. Whenever any books, records, daily return sheets or ticket stubs are lost or destroyed, the operator shall inform the Revenue Commissioner in writing, within ten (10) days of said loss or destruction. Such written notice shall set forth in detail the books, records, daily record sheets or ticket stubs which were lost or destroyed and all pertinent data associated with such loss or destruction. Failure to give the required written notice shall be deemed a failure to keep proper books, records, daily record sheets and ticket stubs under this regulation.↩
.
3. The chart reflects petitioners' version of amounts reported to the City. The record does not include all City returns.↩