**Bruce PICKEL and Lauren Pickel, Appellees,**

v.

**UNITED STATES of America, Appellant.**

**Nos. 83–5672, 83–5684.**

United States Court of Appeals, Third Circuit.

Argued June 7, 1984.

Decided Oct. 5, 1984.

William C. McClure (argued), Charles B. Watkins, Stanley P. DeGory, McClure & Watkins, P.C., Richard Joseph, Pittsburgh, Pa., for appellees.

Glenn L. Archer, Jr., Asst. Atty. Gen., Washington, D.C., J. Alan Johnson, U.S. Atty., Pittsburgh, Pa., Michael L. Paup, Charles E. Brookhart, William A. Whitledge (argued), Tax Div., Dept. of Justice, Washington, D.C., for appellant.

Before WEIS and BECKER, Circuit Judges, and ACKERMAN, District Judge.[*]

## OPINION OF THE COURT

BECKER, Circuit Judge.

The government appeals from an order of the United States District Court for the Western District of Pennsylvania quashing two summonses issued, pursuant to 26 U.S.C. § 7602 (1983), by the Internal Revenue Service. The district court refused to enforce the summonses because of the violation of a sequestration order by a government agent, the refusal of the government to identify an FBI informant, and the court's conclusion that the IRS was acting in "bad faith" by using its civil arm to develop a criminal case. We reverse and remand for further proceedings.

### I. FACTS AND PROCEDURAL HISTORY

Bruce Pickel is the major shareholder and officer of two corporations, Gardner

[*] Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

Steel Corporation and H. Wolfe Iron and Metal Company. In September 1981, IRS Revenue Agent William Manolis conducted an audit of the income tax returns of Pickel, his wife, and the two corporations. During the investigation, Pickel informed Manolis that he had sold a number of securities from a pension fund of one of the corporations to pay off a gambling debt. Pickel also told Manolis that he had since repaid the fund. Thereafter, Manolis independently uncovered other information which, in his mind, indicated the existence of fraud in one or more of the returns under examination. Following established procedures, Manolis referred the case to the IRS's Criminal Investigation Division (CID) for an investigation into possible tax fraud. In October 1982, Special Agent Samuel Ruggiero of the CID was assigned to investigate whether criminal violations of the Internal Revenue Code had occurred.

In July 1982, the Pittsburgh office of the FBI was told by an informant that Pickel was embezzling money from one of the corporate pension funds. The FBI initiated an investigation into the allegations, headed by Agent Peter McCann.[1] In November 1982, the IRS and the FBI each discovered that the other was investigating Pickel. FBI Agent McCann then deferred his investigation until the IRS investigation was terminated, because both inquiries would require access to the same pension records. Shortly thereafter, IRS Special Agent Ruggiero issued the summonses that are the subject of this case. The summonses, issued to Pickel's accountant and bank, sought copies of the Pickels' tax returns for the period 1978 to 1981, the tax returns of the two corporations for the same period, assorted computer printouts of financial records, credit card charge statements, cancelled checks, loan history records, and other financial records pertaining to the Pickels in the possession of the accountant and bank.[2]

The Pickels filed a petition to quash each summons in the district court, pursuant to 26 U.S.C. § 7609(b). In their petitions the Pickels asserted, *inter alia*, that the purpose of the summonses was to gather information for the conduct of an FBI investigation rather than for a valid IRS investigation, and therefore that they were not issued in good faith, and further that the IRS was already in possession of the information it sought. The government responded by denying the allegations in the petition and by moving for summary enforcement of the summonses.

A hearing on the allegations of the petition to quash and on the motion for summary enforcement was held on July 21, 1983. At the beginning of the hearing, the Pickels informed the district court that they intended to call IRS Revenue Agent Manolis, FBI Agent McCann, and IRS Special Agent Ruggiero to testify. At the Pickels' request, the district court ordered that each witness be sequestered during the testimony of the others. Agent Manolis testified first, describing his investigation into the tax returns, and his referral of the case to the CID. He was followed on the stand by Agent McCann, who described the initiation of the investigation into the embezzlement charges, and the discovery of the concurrent IRS investigation of the Pickels' tax returns.

During a recess in McCann's testimony, the Pickels' counsel observed Agent McCann, the FBI attorney and the government attorney, Ms. Scott-Clayton, talking together in the hallway outside the courtroom within earshot of Special Agent Ruggiero, who had not yet testified. After the recess, the Pickels' attorney called the incident to the attention of the court. Agent McCann admitted that he was discussing an exhibit used during the hearing and that he intended that Special Agent Ruggiero hear this discussion so that Ruggiero

---

1. Embezzlement of pension funds and the filing of false pension fund reports with the Secretary of Labor are violations of 18 U.S.C. § 664 and 18 U.S.C. § 1027, respectively, and are therefore within the FBI's domain.

2. The summonses issued to the corporations are the subject of separate enforcement actions pending in the district court.

would not say something contradictory when he got on the stand. The court ruled that its sequestration order had been violated, but deferred imposing sanctions.

McCann resumed his testimony. Shortly thereafter, the Government objected to the Pickels' request that McCann disclose the name of the informant whose information had led to the FBI investigation into the embezzlement charges. The following exchange then took place.

MR. JOSEPH [The Pickels' Attorney]: I want to know who the source is, Your Honor. I think the government is being anything but honest.

THE COURT: I think you are entitled to know.

BY THE COURT:

Q. Tell him what the source was.

MS. SCOTT–CLAYTON [THE GOVERNMENT ATTORNEY]: Your Honor, I must object to this. This is clearly—

THE COURT: I think your objection is overruled. The government has been acting very, very unfairly here in the last hour or so, especially at the recess.

MS. SCOTT–CLAYTON: Your Honor, I apologize. I was just trying to get—

THE COURT: The government violated our sequestration order. The government has obviously been discussing this case with Mr. Ruggiero about matters which Mr. Ruggiero obviously—and information he received ostensibly on a civil mission, and it is now being used in a criminal matter to possibly indict these two people, or one of these persons at least. So I think—

MS. SCOTT–CLAYTON: Your Honor, I—

THE COURT: I think the government has forfeited its right by its actions, and I think that you have got to tell him what the source is. Who is the source?

MS. SCOTT–CLAYTON: Your Honor, divulging this source is not going to harm the government. We are trying to protect the identity—

THE COURT: Well, I don't think—Is there any evidence that Mr. Pickel is violent or a threatening type of man who would assassinate or hurt anybody?

MR. JOSEPH: Absolutely not, Your Honor.

THE COURT: Tell him what the source is.

MS. SCOTT–CLAYTON: Your Honor, may the witness answer whether divulging the source is going to bring any attention on him?

THE COURT: I don't care what your reason is unless—The government failed to honor our

MR. JOSEPH: Your Honor,—

THE COURT: You don't have to say anything more, Mr. Joseph. I am going to ask them to—

MR. JOSEPH: If they don't want to reveal the source, grant the petition [to quash].

MS. SCOTT–CLAYTON: I must insist on—

THE COURT: I am going to grant the petition to quash, simple as that, in 83–200, and I am going to grant the petition [to quash] in 83–938.

The district court thereupon justified its action on the grounds that:

[I]t is clear that the government has not acted in good faith in this matter. It is clear to this Court that the government has acted in a manner wherein they have actually used the IRS's civil arm in order to develop a criminal case against this man . . . .

It is clear that the government refuses to give the source of their information in the situation where it is possible there is no such source, or if the source is a source, that the credibility of the government ought to be tested . . . .

and the Court feels it has the duty to do it as a sanction for the court's finding that the government has flagrantly and clearly violated this court's sequestration order . . . .

in fact the government has acted in bad faith generally . . .

The court concluded:

when I see a flagrant violation of a sequestration order in this court, when I

see communications indicate to me that the Internal Revenue Service was using its civil offices to prosecute criminals or to get information for use to indict, to prosecute an alleged criminal, well, I think it is wrong...."

The Court then adjourned. Orders granting the petitions to quash were filed the next day.[3] The government appeals.

## II. DISCUSSION

The precise basis of the court's decision to grant the petitions to quash the summonses is unclear. It appears to be based in relatively equal measure on three factors: (1) the court's displeasure over the violation of its sequestration order; (2) the court's conclusion that the government acted in bad faith by using civil processes to aid a criminal investigation; and (3) the government's failure to disclose the identity of the FBI's source. We must determine whether any of the factors relied on by the district court would justify quashing the summonses in this case.

### A. Disclosure of the Informant's Identity

■ In *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), it was recognized that the government has a qualified privilege to refuse to disclose the identity of a confidential informant who has provided information about alleged criminal activity. In determining whether the privilege should be sustained, a court must "balanc[e] the public interest in pro-

tecting the flow of information against the individual's right to prepare his defense." *Id.* at 62, 77 S.Ct. at 629.[4]

■ Pickel seeks to learn the identity of the FBI's informant to attempt to tie the FBI's investigation to that of the IRS, and thus to establish that the summonses issued by the IRS were issued for purposes other than a tax investigation. However, Pickel has advanced nothing more than speculation as to the government's bad faith. The individual seeking disclosure has the burden of establishing the significance of the informant's testimony. *United States v. Jiles*, 658 F.2d 194, 196–97 (3d Cir.1981). *See United States v. Bazzano*, 712 F.2d 826, 839 (3d Cir.1983) (in banc) ("'[M]ere speculation as to the usefulness of the informant's testimony to the defendant is insufficient to justify disclosure of his identity.'" (quoting *United States v. Estrella*, 567 F.2d 1151, 1153 (1st Cir. 1977))). The Pickels have not met their burden. As we explain *infra*, the IRS is empowered to issue summonses for a valid tax investigation, whether of a criminal or civil nature. On the current record, there is no evidence that the IRS is not involved in such an investigation, and it is unclear how revealing the identity of the FBI's informant would produce such evidence. If it is established later that the IRS has used its summons power inappropriately, the Pickels' rights can be adequately protected by suppressing the improperly acquired evidence in a criminal proceeding.

---

**3.** While the district court concluded that the sequestration order was violated, it made no subsidiary findings, including whether Agent Ruggiero actually heard Agent McCann's statements. The government does not concede that Agent Ruggiero heard the remarks. The court refused to allow Agent Ruggiero to testify about whether he had heard McCann's statements, observing that his testimony was tainted. If Agent Ruggiero did not hear the remarks it would have been error to exclude his testimony because of McCann's violation of the order. *See United States v. Warren*, 578 F.2d 1058, 1076 n. 16 (5th Cir.1978), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980) ("[The trial judge] ordinarily will not exclude witnesses without a demonstration of probable prejudice.").

**4.** The government's right to withhold the identity of a witness is applicable in non-criminal proceedings as well. While it is by no means clear that the respondent in an administrative summons proceeding has the same right as a defendant in a criminal case to override the privilege so as to insure his right to a fair trial, we so assume for purposes of this case. *Westinghouse v. City of Burlington*, 351 F.2d 762, 769 (D.C.Cir.1965) (The fact that the case is civil rather than criminal is not dispositive ... The *Roviaro* balance should be struck in each case, civil and criminal, in deciding whether disclosure "is essential to a fair determination of a cause.").

■ The district court did not consider these precepts. Instead, the court simply ruled that the government had "forfeited" its privilege because Agent McCann had violated the sequestration order. There is no authority, however, for holding that the privilege is forfeited by the unilateral act of a single agent, and the district court erred in doing so. Neither can the district court's conclusion that failure to disclose the informant's identity demonstrated the government's bad faith assist the Pickels, because the refusal was justified. In sum, the refusal of the government to disclose the informant's identity is not a proper ground for quashing the summonses in this case.

### B. Violation of the Sequestration Order

■ The district court concluded that it had both the power and the duty to quash the summonses as a sanction for Agent McCann's violation of the court's sequestration order. Fed.R.Evid. 615 deals specifically with the sequestration of witnesses, and is applicable to IRS summons proceedings.[5] See Fed.R.Evid. 1101(b). Rule 615 does not explicitly address the question of sanctions for non-compliance. The case law, however, suggests three appropriate forms of sanctions: (1) holding the witness in contempt, *Holder v. United States*, 150 U.S. 91, 14 S.Ct. 10, 37 L.Ed. 1010 (1893), *United States v. Eastwood*, 489 F.2d 818 (5th Cir.1973); (2) comment by the court on the violation and its effect on weight or credibility of the witness' testimony, *Holder, supra;* and (3) barring or striking the witness' testimony, *United States v. Gibson*, 675 F.2d 825 (6th Cir.1982). *See generally*, 3 Weinstein & Berger, *Weinstein's Evidence* ¶ 615(03) (1982).

We also assume that Fed.R.Civ.P. 41(b),[6] which allows the court to dismiss claims for violation of any court order,[7] might support a dismissal in a most egregious situation.[8]

■ But the law of this circuit is that Rule 41(b) dismissal should be reserved for cases where there is a clear record of delay or contumacious conduct by the plaintiff. Furthermore, it is necessary for the district court to consider whether lesser sanctions would better serve the ends of justice. *See Titus v. Mercedes Benz of North America*, 695 F.2d 746, 749 (3d Cir.1982).

■ In this case, the district court did not consider any of the sanctions appropriate under Rule 615, or make the findings required under the Rule, but instead precipitously decided the case against the government. Moreover, there is no evidence that Agent McCann was acting other than unilaterally when he violated the sequestration order. Nor did Pickel establish any prejudice to his case as a result of the violation of the sequestration order.[9] In view of these considerations, we conclude that the district court abused its discretion

5. Rule 615. Exclusion of Witnesses
   At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause.

6. Rule 41(b) Involuntary Dismissal: Effect Thereof.
   For failure of the plaintiff to prosecute or to comply with these rules of *any order* of court, a defendant may move for dismissal of an action or of any claim against him ... (emphasis added)

7. A Rule 41(b) dismissal may be entered sua sponte or on motion of a party. *See Link v. Wabash R.R.*, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962).

8. Rule 41(b) despite its language, has been held not to apply to all types of orders. For instance, Fed.R.Civ.P. 37 is the exclusive source of sanctions for violations of discovery orders. *Societe Internationale Pour Participations Industrielles at Commerciales, S.A. v. Rogers*, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958).

9. The government denies that Agent Ruggiero even heard Agent McCann's comment, and Agent Ruggiero was not asked to testify on this question.

when it imposed the drastic sanction of quashing the IRS summonses.

### C. *The Government's Alleged Bad Faith*

26 U.S.C. § 7602 empowers the IRS to summon taxpayers for inquiry into their tax liability, to examine "any books, papers, records, or other data" relevant to the inquiry, and to take the testimony of the taxpayer. The Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) Pub.L. No. 97–248, 96 Stat. 324 (1982), amended § 7602 in two ways. First it expanded the purposes for which the summons power could be used, to include criminal as well as civil tax investigations. *Moutevelis v. United States*, 727 F.2d 313 (3d Cir.1984). Second, it drew a "bright line" delineating where the summons power ended: at the point where an investigation was referred to the Justice Department for prosecution.[10] By this change, Congress intended to establish a mechanical test for determin-

ing the validity of the summons. *See* Joint Committee on Taxation, *Annual Explanation of the Revenue Provisions of the Tax Equity and Fiscal Responsibility Act,* 97th Cong. 2d Sess. at 234–36 (1982).

The sections of TEFRA that deal with administrative summonses were, in part, a response to *United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978). *Joint Committee on Taxation, supra,* at 235. *See also* Senate Report No. 494, 97th Cong. 2d Sess. 285–87 (1982), *reprinted in* 1982 U.S.Code Cong. & Admin.News 781, 1030–32. *LaSalle National Bank* dealt with the application of the "good faith" requirement for the enforcement of administrative summonses to cases in which a summons was being used to investigate a criminal violation of the tax laws.[11] Prior to TEFRA, the good faith requirement limited the use of summonses to civil investigations; a summons issued as part of a criminal investigation was considered to be improper,

---

**10.** TEFRA added the following subsections, among others, to § 7602:

(b) Purpose may include inquiry into offense.—The purposes for which the Secretary may take any action described in paragraph (1), (2), or (3) of subsection (a) include the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws.

(c) No administrative summons when there is Justice Department referral.—

(1) Limitation of authority.—No summons may be issued under this title, and the Secretary may not begin any action under section 7604 to enforce any summons, with respect to any person if a Justice Department referral is in effect with respect to such person.

(2) Justice department referral in effect.—For purposes of this subsection—

(A) In general—A Justice Department referral is in effect with respect to any person if

(i) the Secretary has recommended to the Attorney General a grand jury investigation of, or the criminal prosecution of, such person for any offense connected with the administration or enforcement of the internal revenue laws, or

(ii) any request is made under section 6103(h)(3)(B) for the disclosure of any return or return information (within the meaning of section 6103(b) relating to such person).

**11.** The good faith requirement originated in *Reisman v. Caplin*, 375 U.S. 440, 449, 84 S.Ct.

508, 513, 11 L.Ed.2d 459 (1964) and *United States v. Powell*, 379 U.S. 48, 58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964). *Powell* set forth the standards for enforcement of a summons:

> [The IRS] must show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed ... It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused. Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation. The burden of showing an abuse of the court's process is on the taxpayer.

379 U.S. 57, 58, 85 S.Ct. 254, 255 (footnotes omitted). *Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971) held that under § 7602 "an internal revenue summons may be issued if ... it is issued in good faith and prior to a recommendation for criminal prosecution." 400 U.S. 536, 91 S.Ct. at 545. That there was the potential of a criminal prosecution did not preclude the summons from being enforceable because there was a clear, civil purpose for the summons to issue.

because it fell beyond the scope of congressional authorization and thus was held to be unenforceable. In *LaSalle National Bank*, the agent who issued the summons was found to be conducting his investigation "solely for the purpose of unearthing evidence of criminal conduct." 437 U.S. 299, 98 S.Ct. 2359. Nevertheless, the summonses were ordered enforced. The court determined that the criminal and civil elements of tax enforcement were inherently intertwined. "When an investigation examines the possibility of criminal misconduct, it also necessarily inquires about the appropriateness of the 50% civil tax penalty." *Id.* at 309, 98 S.Ct. 2363.

The Court believed that the criminal and civil aspects of an investigation diverged only when the IRS had finally determined to recommend a case to the Justice Department for a criminal prosecution. The Court therefore ruled invalid a summons issued after the formation of an "institutional commitment" to recommend to the Department of Justice that a criminal prosecution be undertaken. 437 U.S. at 318, 98 S.Ct. at 2368. If the summons was issued before any recommendation, it was the institutional posture of the IRS that determined whether the summons was valid: if the IRS had not institutionally abandoned the pursuit of a civil tax determination or collection, the summons was valid. The purpose of the good faith inquiry, said the Court, was to "determine whether the agency is honestly pursuing the goals of § 7602 by issuing the summons." 437 U.S. at 316, 98 S.Ct. at 2367. The Court cautioned that where the IRS acted merely as an information gathering agency for another department, or inappropriately delayed recommending prosecution to the Justice Department, enforcement of the summons would be prohibited. 437 U.S. at 317, 98 S.Ct. at 2367.

■ The four dissenters, in an opinion by Justice Stewart, argued against an examination of the "institutional good faith" of the IRS as the yardstick for summons enforcement. They preferred a bright line test: to enforce a summons it must be issued in good faith and prior to a recommendation for criminal prosecution. 437 U.S. at 320, 98 S.Ct. at 2369, quoting *Donaldson v. United States*, 400 U.S. 517 at 536, 91 S.Ct. at 545. Section 7602, according to the dissenters, did not prohibit the issuance of a summons for a purely criminal investigation, and the civil/criminal distinction embodied in the good faith requirement was "unjustified, unworkable and unwise." 437 U.S. at 321, 98 S.Ct. at 2369. Congress codified the position of the dissenters in *LaSalle National Bank* by enacting the TEFRA amendments to section 7602. *Moutevelis v. United States*, 727 F.2d at 315. A summons is now enforceable if it is issued in good faith, i.e., if it is for the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws, and if it is issued before there is a Justice Department referral.

■ The IRS advanced uncontradicted evidence that the summonses in controversy here were issued because Pickel had admitted to the revenue agent that he had "borrowed" funds from one of the corporate pension funds, and because the revenue agent discovered other indications of fraud in the tax returns of Pickel and his wife, in possible violation of 26 U.S.C. § 7206(1).[12] The Pickels, as the parties opposing the summonses, bore the burden of showing either (1) that the summonses were not issued for a congressionally authorized purpose under § 7602, i.e., were not issued as part of a legitimate investigation into a violation of the tax laws, but were instead issued to gather evidence for another agency or to harrass or pressure taxpayers in connection with another matter, or (2) that a Justice Department referral had taken place. This burden has been characterized as a heavy one, *LaSalle Na-*

---

12. Section 333 of TEFRA, which amended 26 U.S.C. § 7602, took effect on September 3, 1982, and the summonses pertaining to the Pickels were issued after that date.

*tional Bank,* 437 U.S. 298, 98 S.Ct. 2357, and as "almost insurmountable." *United States v. Garden State National Bank,* 607 F.2d 61, 69 (3d Cir.1979).

The district court based its decision to quash the summons in part on the fact that the IRS was using its "civil arm in order to develop a criminal case" against the taxpayer. Investigation of criminal violations of the Internal Revenue Code, however, is a valid purpose for issuance of a summons under § 7602. *Moutevelis,* 727 F.2d at 315. We do not doubt that portions of the *Powell* and *LaSalle* discussions of bad faith retain vitality and that where the taxpayer can prove that the summons is issued solely to harass him, or to force him to settle a collateral dispute, *Powell,* 379 U.S. at 58, 85 S.Ct. at 255, or that the IRS is acting solely as an information-gathering agency for other departments, such as the Department of Justice, *LaSalle,* 437 U.S. at 317, 98 S.Ct. at 2367, or the FBI, the summons will be unenforceable because of the IRS's bad faith. Congress has not authorized the IRS to pursue these ends.[13] But the Pickels have not come forward with any evidence that would justify such a conclusion.

## III. *CONCLUSION*

We have examined the three factors on which the district court relied in quashing the summons, and have concluded that none of them justifies the district court's action in this case, nor would they taken together. The district court acted before the hearing was complete, however, and we therefore believe that the Pickels should have an opportunity to adduce evidence to meet their heavy burden, and the government to counter such evidence and complete its case for enforcement. The judgment of the District Court will be reversed, and the case remanded for proceedings consistent with this opinion.

---

**13.** It is also quite clear that Congress did not intend for the TEFRA amendments to IRC § 7602 to broaden the right of criminal dis-

covery, or infringe on the grand jury's domain. Joint Comm. on Taxation, *supra,* at 236; Sen. Rep. No. 494, 97th Cong., 2d Sess., 286.