**UNITED STATES of America,**

v.

**Mukund N. MEHTA, Defendant.**

**No. CRIM.01–10180–NG.**

United States District Court,
D. Massachusetts.

Dec. 31, 2002.

---

R.J. Cinquegrana, Choate, Hall & Stewart, Boston, MA, for Mukund N. Mehta (1), Defendant.

Michael J. Pineault, United States Attorney's Office, for U.S. Attorneys.

## MEMORANDUM AND ORDER RE: DEFENDANT'S MOTION FOR RECONSIDERATION OF MAGISTRATE'S ORDER THAT DEFENDANT MAKE FURTHER EXPERT DISCLOSURES AND DEFENDANT'S MOTION TO SUPPRESS

GERTNER, District Judge.

### I. *INTRODUCTION*

Defendant Mukund Mehta ("Mehta") has been charged with three counts of tax evasion under 26 U.S.C. § 7201 and eleven counts of mail fraud under 18 U.S.C. § 1341. The indictment alleges that Mehta understated his business' gross sales by a total of more than $800,000 in his tax filings for 1994, 1995, and 1996, and by more than $1,700,000 in his weekly reports to Sir Speedy, Inc., with which he had a franchise agreement.

### II. *FACTUAL BACKGROUND OF THE TAX ALLEGATIONS* [1]

In 1984, Mehta opened a copy shop as a Sir Speedy franchise in Needham, Massachusetts. That year, he hired James Pattangall ("Pattangall") to perform accounting services for the copy center and to prepare his tax returns. Pattangall con-

---

1. This recitation of facts is based on the government's account, as alleged in the indictment.

tinued to perform these services for a number of years and prepared Mehta's tax returns in 1994, 1995, and 1996.

Under the terms of the franchise agreement, Mehta was required to pay Sir Speedy a royalty fee equal to five percent of the printing center's "gross sales" as well as an advertising fee equal to two percent of the printing center's gross sales. Specifically, the franchise agreement required Mehta to report the printing center's gross sales to Sir Speedy on a weekly basis via a transmittal sheet that Mehta was to mail to the company's corporate offices in California. Along with the transmittal sheet, Mehta was to send two checks: one representing that week's five percent royalty amount and the second representing that week's two percent advertising fee.

Instead of sending in weekly reports, Mehta mailed the transmittal sheets in batches with one to six months' worth of weekly transmittal sheets. Each batch would also have the royalty and advertising checks computed on the basis of the gross sales reported on the transmittal sheets.

For the calendar years 1994, 1995, and 1996, the government claims, Mehta under-reported the total gross sales to Sir Speedy:

| | |
|---|---|
| 1994 | $242,151 |
| 1995 | $266,970 |
| 1996 | $303,395 |

For the same period, Mehta filed tax returns which listed substantially more in gross sales than had the transmittal sheets:

| | |
|---|---|
| 1994 | $604,690 |
| 1995 | $625,336 |
| 1996 | $790,079 |

In 1997, Sir Speedy notified Mehta that it would audit his books for the years 1994–1996. Mehta then informed the company that he wished to terminate the franchise agreement. In connection with negotiations surrounding the agreement's termination, and determination of the final amounts owed by Mehta, Mehta provided Sir Speedy with yet a *third* set of figures for the gross sales of 1994, 1995, 1996. In addition, Mehta submitted what purported to be copies of his federal and state income tax returns to substantiate this set of figures. These documents, however, were false, and different from either the initial transmittal sheets or the actual tax returns:

| | |
|---|---|
| 1994 | $350,774 |
| 1995 | $346,245 |
| 1996 | $429,895 |

Finally, also in 1997, the IRS audited Mehta. Mehta and his wife then filed revised tax returns, providing a *fourth* set of figures for the gross sales of the Printing Center, the highest yet:

| | |
|---|---|
| 1994 | $920,531 |
| 1995 | $897,006 |
| 1996 | $1,051,404 |

## III. *MOTION FOR RECONSIDERATION OF MAGISTRATE JUDGE'S EXPERT DISCLOSURE ORDER*

Between November and February of 2001, Mehta and the government both made disclosures regarding their expected expert tax witnesses pursuant to Federal Rules of Criminal Procedure 16(a)(1)(E) and 16(b)(1)(C). Magistrate Judge Collings found Mehta's disclosure inadequate and ordered further disclosure. The defendant now has moved this Court to reconsider and set aside Magistrate Collings' order.

Because I find that Mehta's disclosure fulfilled the requirements of Rule 16(b)(1)(C), his Motion is hereby GRANTED; and the Magistrate Judge's Order is REVERSED.

### A. *Procedural Background to the Disclosure Issues*

In September of 1997, the IRS informed Mehta that his 1995 tax return had been

selected for audit. In May of 1998, after gathering various information and conducting an analysis of Mehta's tax returns, the IRS referred the case for potential tax fraud prosecution. In May of 2000, the IRS notified Mehta that his file had been forwarded to the Justice Department for criminal prosecution.

In August of 2000, Mehta's attorney[2] sent a letter to an IRS investigator arguing that Mehta's underpayment was the result of Pattangall's reckless and unprofessional conduct, rather than any fraudulent intent on Mehta's part, and urging the government not to prosecute. In October, Mehta's counsel apparently met with attorneys from the tax division of the Department of Justice and again tried to persuade the government not to seek criminal charges against his client. Mehta's counsel followed up this meeting with another letter—this one spanning eighteen pages and listing in seemingly exhaustive detail Pattangall's alleged acts of misconduct.

Specifically, these letters identified four distinct professional shortcomings on Pattangall's part. First, the letters alleged that he failed to bring to Mehta's attention the fact that the monthly balance sheets Pattangall prepared indicated that cash was decreasing significantly at the same time his *pro forma* balance sheets showed that cash was increasing. Second, they suggest that Pattangall used inventory figures that were clearly inflated and conflicted with the figures on Pattangall's own *pro forma* balance sheets. Third, they accused Pattangall of violating professional accounting standards by using estimates for over-the-counter sales figures—even as these sales exceeded $20,000 per month in 1996. Finally, they claimed that Pattangall violated Treasury Regulations by using the cash method of accounting, rather than the accrual method.

Counsel's efforts to convince the government not to prosecute were to no avail. On May 24, 2001, a Grand Jury returned an indictment charging Mehta with tax evasion in relation to his 1994, 1995, and 1996 tax returns.

On December 10, 2001, the government responded to Mehta's request for discovery regarding expected expert testimony pursuant to Rule 16(a)(1)(E). The government's disclosure informed the defendant of its intent to call an IRS agent to testify regarding "financial information contained in Mehta's bank records and an analysis of the business receipts reflected in those records that should have been reported on Mehta's federal income tax returns, but were not." Earlier, the government also had provided Mehta with a substantial stack of draft charts and schedules setting forth the results of the IRS' analysis. The charts, however, did not describe *why* the IRS expert concluded that a particular item counted in the gross sales figure. Rather, they simply listed deposits counted as taxable, after applying a methodology called the "bank deposit method of proof." The disclosure states that this methodology involves "reviewing the deposits into Mehta's personal and business bank accounts and investigating the source of those deposits to ascertain which deposits represented business income."

On February 21, 2002, Mehta offered reciprocal disclosure, pursuant to Rule 16(b)(1)(C), regarding the testimony of his anticipated expert tax witness. The expert would testify in response to the government's analysis based on his own analysis of Mehta's business and personal bank accounts. The disclosure contained information similar to the government's—a general statement of methodology, based

---

2. Mehta has since retained new counsel.

on the data that the government used. In addition, the expert was to testify concerning Pattangall's conduct and whether it was in compliance with "generally accepted accounting practices." Finally, Mehta provided the government with the qualifications of the witness.

On February 26, 2002, the government complained to the Court that Mehta's disclosure letter was inadequate. Mehta supplemented his disclosure later that day. He outlined specific topics: "identification of the accounts used for the deposit of business income; deposit and withdrawal activity in relation to those accounts; identification of accounts used for saving; deposit and withdrawal activity in relation to those accounts; and audit of the transfer analysis conducted by the government." He outlined the basis for the testimony: the records and schedules produced by the government and the expert's own factual investigation. As of the time of the letter, the expert had not yet created any documents "which would be used as exhibits at trial," but the defense promised that "in the event he does so, they will be disclosed to you."

Second, the defense indicated that the testimony concerning Pattangall's conduct when preparing Mehta's taxes in 1994, 1995, and 1996 would be based on *Jencks* material relating to Pattangall and Mehta's tax returns for 1994, 1995, and 1996, which the defense had not yet received. The defense noted that the expert's opinion, based on the information the defense already had, was that Pattangall's "conduct was not in compliance with generally accepted accounting practices, including [his] failure generally to follow the requisite standard 'due care' in preparing Mr. Mehta's tax returns."

On March 11, Magistrate Judge Collings issued an Order describing Mehta's disclosures as "woefully inadequate" and setting forth two specific orders. The first part required the following:

> if the expert is going to testify that any items, which the Government claims were income to the defendant, were not, in his opinion, income to the defendant, he shall list each item and explain why he is of the opinion that the items were not income and thus not properly included in the income which the defendant did report.

The second part required the following:

> [I]f the expert is to testify as to opinions as to Mr. Pattangall's conduct, he shall state those opinions with specificity and the reasons why he holds the opinions. The disclosure must contain specific instances in which Mr. Pattangall's conduct was not in keeping with generally accepted accounting practices, the specific generally acceptable accounting practices which were not followed, and the reasons why the expert holds the opinion that the acts or failure to act of Mr. Pattangall were not in keeping with generally accepted accounting procedures.

On March 21, Mehta filed the present Motion for Reconsideration of Judge Collings' order with this Court.

### B. *Standard of Review*

Under Rule 2(b) of the local magistrate rule, this Court should "modify or set aside any portion of the magistrate judges's order determined to be clearly erroneous or contrary to law." One circuit court has explained that, under this standard, a district court should only overturn a magistrate's order when "left with the definite and firm conviction that a mistake has been made." *Weeks v. Samsung Heavy Industries Co.*, 126 F.3d 926, 943 (7th Cir. 1997).

## C. *Rule 16(b)(1)(C)*

The defendant argues that, because his disclosure already satisfied Rule 16(b)(1)(C)'s requirements, Judge Collings' order requiring additional disclosure is contrary to law. In relevant part, 16(b)(1)(C) sets forth the following requirements:

> [T]he defendant shall, at the government's request, disclose to the government a written summary of testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial: … if the defendant requests disclosure under subdivision (a)(1)(E) of this rule and the government complies…. This summary shall describe the witnesses' opinions, the bases and reasons for those opinions, and the witnesses' qualifications.

In short, the Rule requires reciprocal disclosure of three types of information: (1) the expert witnesses' opinions, (2) the bases for those opinions, and (3) the expert's qualifications. *United States v. Yoon,* 128 F.3d 515, 526 (7th Cir.1997) (citation omitted).

The *type* of information that must be disclosed under this Rule is thus very clear. The *quantity* and *specificity* required of the disclosure, however, is less so. As Judge Collings has noted, the scope of the disclosure required by this Rule and Rule 16(a)(1)(E) "seems unsettled." *United States v. Wilkerson,* 189 F.R.D. 14, 15 (D.Mass.1999); *see also 25 Moore's Fed. Practice* ¶ 616.05[3] (Matthew Bender 3d ed. 1997) ("It is not yet clear exactly how much detail must be provided to satisfy [Rules 16(a)(1)(E) and 16(b)(1)(C) ].").

As stated above, Mehta has fully disclosed his expert's qualifications by providing the government with a copy of the expert's curriculum vitae. The question raised by Judge Collings' order is whether Mehta has provided sufficiently specific disclosure regarding the expert's opinion and the bases for that opinion.

One way to decipher the meaning of the criminal expert discovery rules is to compare them to the civil discovery rules, which are much broader. While Fed. R.Civ.P. 26(a)(2) requires a "complete statement" of the expert's opinion, the criminal rule requires only a "summary of testimony." Civil Rule 26(a)(2) additionally requires the disclosure of: "all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness informing the opinions; any exhibits to be used as a summary or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witnesses within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the proceeding four years." Moreover, the civil rules allow further discovery through interrogatories and depositions; there is no such avenue under the criminal rules.

The difference between the civil and criminal rules derives from the special constitutional constraints of criminal proceedings. Intuitively, discovery against a criminal defendant raises the specter of infringing the Fifth Amendment privilege against self-incrimination.[3] While courts

---

3. The essential problem is that "unless the government can prove a case sufficient to go to the jury, a defendant need produce nothing. There is nothing in Rule 16 that prevents the government from using material that it has obtained by discovery as part of its own case-in-chief, and thus it may be that there will be cases where the government is able to make a prima facie case only with the aid of evidence it has obtained by discovery."

have upheld the basic notion of reciprocal criminal discovery on the theory that a defendant can waive the privilege in order to obtain discovery against the government, some constitutional limitations surely remain. *See Wardius v. Oregon*, 412 U.S. 470, 475 n. 9, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973) (noting inherent discovery advantages of prosecution and concluding that "if there is to be any imbalance in discovery rights, it should work in defendant's favor"); 2 Charles Alan Wright, *Federal Practice and Procedure* § 256 (3d ed.2000).

In addition, the government in a tax case such as this one starts with a singular advantage that a party in a civil case does not. Long before indictment, the government has access to civil and criminal IRS summonses, the grand jury subpoena, etc. It also has met with the taxpayer and his counsel, received records, and heard the defense theory.

### 1. *Income Issues*

 Judge Collings' order requires the defendant to provide even more information than the government has provided. While the government simply described its conclusions generally, and provided summary tables classifying bank deposits, Judge Collings would require that the defendant not only list each item, as the government already has done, but "explain why he is of the opinion that the items were not income and thus not properly included in the income which the defendant did not report." The government was not required to explain *why* it characterized each item as it did and it would be incongruent and improper to require the defense to do so.

Indeed, the defendant's submission was, in some ways, more specific. The defen-

dant described the expert's methodology, the particular type of entries that he will emphasize—*e.g.*, deposit and withdrawal activities in relation to the business accounts—and indicated that the defense expert would also rely on the "records and schedules" the government had produced as well as the expert's own factual investigation. The defense further acknowledged that if the expert created any documents to be used as trial exhibits, they will be disclosed.

Simply put, each side's disclosures have been *qualitatively* similar, in keeping with the rules. At the same time, government's disclosure was *quantitatively* larger, if one includes the stack of summary charts that list individual deposits, etc. in Mehta's bank accounts that the government alleges to be "income." But the government cannot rely on sheer quantity of paper to "flush out" more information from the defense than is required under the rules.

Significantly, the defense is under no obligation to create a competing, comprehensive accounting of Mehta's finances at all; it simply needs to attack the government's case. Thus, any incongruence in disclosure is simply a function of the burdens of proof in a criminal case.

The government properly has provided summary charts supporting its specific allegations of fraud and has described generally the methodology used in creating those charts. In response, the defense has described generally the methodology it will use to attack them. Nothing more is required.

### 2. *Pattangall Issues*

 With regard to the critique of accountant Pattangall, the defendant's disclosure made clear that the expert would opine that Pattangall failed to comply with

2 Charles Alan Wright, Federal Practice and Procedure § 256 (3d ed.2000).

appropriate standards of professional conduct when preparing Mehta's taxes. The disclosure identified Mehta's tax returns and *Jencks* material relating to Pattangall as the bases for this opinion. Again, Judge Collings' Order requires more extensive disclosure regarding both the expert's opinion and the bases for the opinion—namely "the specific instances" in which Pattangall's conduct was not consistent with generally accepted accounting principles, the specific principles that were not followed, the reasons why the expert believes that Pattangall's acts failed to comply with the generally accepted accounting procedures. Nothing in the rules requires that degree of specificity, particularly in advance of the disclosure of *Jencks* material concerning Pattangall's interviews with the government.

In any event, as noted above, the government already has much of the information it now requests. The case did not begin with the indictment. Mehta's predecessor counsel's letters urging the government not to prosecute provided a detailed description of Pattangall's alleged misconduct. The expert's testimony may expand somewhat on the description of the misconduct provided in these letters and will likely offer a more nuanced analysis, but it is surely not going to take the government by surprise. Mehta's disclosure, when viewed in relation to the information set forth in the previous letters, provides the government with "a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R.Crim.P. 16 Advisory Committee Notes,

1993 Amendment. Rule 16(b)(1)(C) requires nothing more.

Additionally, the government has not yet provided Mehta with *Jencks* material relating to Pattangall. Because Mehta's disclosure indicates that this material will likely constitute part of the basis for his expert's opinion, the expert clearly has not yet finalized his opinion. Requiring disclosure as extensive as that set forth in Judge Collings' Order would force the expert to predict what his opinion will be at trial without having access to all of the information on which he will base his opinion at that time. Rule 16(b)(1)(C) surely does not require this kind of disclosure.

In conclusion, the essential policies underlying Rule 16 are satisfied. The Advisory Committee primarily was concerned that in the absence of advance discovery, the party cross examining an expert as to the basis of the expert's opinions could unwittingly elicit prejudicial and inadmissible evidence.[4] There is no such danger here. Mehta's expert will base his conclusions, for the most part, on the government's data. To require Mehta's expert to disclose why he challenges each purported item of "income"—essentially going line by line—would be to require not an expert summary, but effectively an expert deposition. To require Mehta's expert to disclose his final opinion of Pattangall before the government has disclosed its interviews with him would force production of an incomplete opinion and set a potential impeachment trap for the defense expert. All of this would result in grossly incongruent and inequitable disclosure obli-

---

4. The Advisory Committee Notes to the 1993 Amendment to the Criminal Rules cites a law review article, Linda Eads, *Adjudication by Ambush: Federal Prosecutors' Use of Nonscientific Experts in a System of Limited Criminal Discovery*, 67 N.C.L.Rev. 577, 591 (1989). Specifically, Eads points to Rules 703 and 705. Rule 703 allows experts to rely on facts or data reasonably relied on by members of their field whether or not the data are admissible. Rule 705 does not require disclosure of the bases of an expert's opinion on direct examination.

gations, which are surely not required under the rules.

## IV. MOTION TO SUPPRESS AND/OR DISMISS FOR ALLEGED "MIS-USE" OF IRS SUBPOENA POWER

The defendant also moves to suppress evidence obtained by Special Agents of the Criminal Investigation Division ("CID") of the IRS, or in the alternative, that the Court dismiss the indictment now pending against him. Essentially, the defendant argues that records were obtained by summons after, as the defendant describes it, the IRS already had made an "institutional commitment" to refer the case to the Justice Department, or had essentially decided to proceed solely by way of a criminal prosecution. He argues that once the IRS determined to pursue a criminal prosecution, its use of the administrative summons mechanism was improper, and that this impropriety warrants suppression. The resolution of this matter depends upon the facts, and to a degree, on law which is not entirely settled. Nevertheless, I agree with the government: Whatever legal test one applies, Mehta's claim fails.

### A. Summons Facts [5]

While negotiating the termination of his Sir Speedy franchise, Mehta received an audit notice from the IRS dated September 17, 1997. In January of 1998, Mehta's then counsel, informed the IRS that Mehta would not cooperate with the audit. IRS Agent Steven Winsten requested information from Sir Speedy, following it up with an IRS summons on March 12, 1998. The subject matter of the summons was the amount of sales or revenues reported by Mehta to Sir Speedy. Thereafter, Winsten issued summonses to Mehta's various banks. Comparison of Mehta's bank deposits to his revenue for 1996 suggested a difference of $227,430. The defendant notes that two years later, at the time of the formal referral to the Department of Justice ("DOJ"), the final figure for the discrepancy was similar, $237,914.

Sir Speedy provided the IRS with schedules showing gross sales reported to it during 1995 and 1996. Winsten immediately suspected that Mehta had defrauded Sir Speedy. By April of 1998, Winsten had concluded that Mehta under reported his income to the IRS and had defrauded Sir Speedy for the years 1995 and 1996.

Winsten referred Mehta's case to CID in May of 1998. CID went over some of the same ground as Winsten, summonsed additional records, and performed a bank account analysis. At that point, there were discussions suggesting that the IRS would permit the civil statute of limitations for the 1995 tax year to expire, a decision which the IRS reversed a month later. Conversations between Mehta's new counsel (his second) and CID agent Gianoukos suggested that the matter was being treated as a criminal investigation. Additional summonses were then issued by CID.

Mehta contends that "by the time Revenue Agent Winsten referred Mehta's case to CID, the IRS was committed to the indictment of Mehta."

### B. Legal Issues

The legal test for the propriety of an IRS summons is not entirely clear. Prior to its amendment in 1982, 26 U.S.C. § 7602 authorized the IRS to issues administrative summonses to determine tax liability and to make collections—civil pur-

---

5. These are undisputed facts crediting, for purposes of this discussion only, inferences in favor of the defendant's arguments.

poses. In addition, the Supreme Court held that since the tax enforcement system has interrelated criminal and civil elements, the IRS could use summonses in dual purpose investigations. *See U.S. v. LaSalle Nat'l Bank,* 437 U.S. 298, 310–11, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978). At the same time, the Court admonished, "the IRS must use its summons authority in good faith." *Id.* at 313, 98 S.Ct. 2357 (citing *Donaldson v. U.S.,* 400 U.S. 517, 536, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971)). Specifically, a summons would be in bad faith and invalid if used "*solely* for a criminal investigation." *Id.* at 314, 98 S.Ct. 2357 (emphasis added). The Court explained that abandonment of civil purpose occurs when a case is formally referred to DOJ for prosecution. *See id.* at 311, 98 S.Ct. 2357. In addition, courts should "not countenance delay in submitting a recommendation to the Justice Department when there is an institutional commitment to make the referral and the Service merely would like to gather additional evidence for the prosecution." *Id.* at 316–17, 98 S.Ct. 2357.

Congress amended § 7602 in 1982. Today, the IRS may issue summonses for "the purpose of inquiring into *any offense* connected with the administration or enforcement of the internal revenue laws." 26 U.S.C. § 7602(b) (emphasis added). Apparently codifying the holding in *LaSalle,* the statute as amended further provides that "[n]o summons may be issued . . . with respect to any person if a Justice Department referral is in effect with respect to such person." 26 U.S.C. § 7602(d)(1).

According to the government, the amended statute supercedes *LaSalle* and replaces the "good faith" or "institutional commitment" inquiry with a "bright line" rule: the IRS enjoys criminal summons power terminating only at the point when an investigation actually is referred to DOJ. *See, e.g., Weiss v. Comm'r of Internal Revenue,* 919 F.2d 115, 115, n. 1 (9th Cir.1990) ("Congress eliminated the requirement that, for a summons to be valid, the IRS investigation must have a civil component"); *LaMura v. United States,* 765 F.2d 974, 980 n. 9 (11th Cir.1985) (suggesting that actual referral is the only basis for objection to summons and stating that amended statute eliminated *LaSalle* "institutional commitment" ground); *Pickel v. U.S.,* 746 F.2d 176, 183–84 (3d Cir. 1984) (explaining that amended statute expressly authorizes summonses for criminal investigations). The defense counters that the "good faith" requirement remains in force. For example, in *U.S. v. Lawn Builders of New England,* 856 F.2d 388, 391–92 (1st Cir.1988), which post-dated the 1982 amendments but did not examine their effect, the First Circuit stated that for a summons to be enforceable, the IRS "must not have abandoned the pursuit of civil tax determination or collection."[6] *See also U.S. v. Michaud,* 907 F.2d 750, 752 (7th Cir.1990); *Hintze v. IRS,* 879 F.2d 121, 127 (4th Cir.1989) ("The tax payers here might well have prevailed, moreover, had they succeeded in showing that the IRS was pursuing its investigation for the sole purpose of building a case on anticipated criminal charges"); *U.S. v. MacKenzie,* 777 F.2d 811, 819 (2d Cir.1985) (holding that law "allows inquiry" into IRS "good faith" even if the summonses were

---

**6.** The only other First Circuit case on this issue, *Copp v. U.S.,* 968 F.2d 1435 (1st Cir. 1992), affirmed the district court's denial of a motion to quash an IRS summons on factual grounds without addressing the district

court's legal determination (in an unpublished opinion) that no "sole criminal purpose" challenge was available after the 1982 amendments to § 7602.

issued before a criminal recommendation").

While the law is thin, if I had to decide the issue here I would be inclined to follow the plain language of *Lawn Builders* and conclude that a "good faith" test survives the 1982 amendments. The Supreme Court itself drew the "bright line" of DOJ referral in *LaSalle*, while recognizing that the test was imperfect because the IRS could be tempted to delay referral and unfairly exploit its administrative summons power. Defendants must retain some recourse from that species of "bad faith" if the procedural protections of the grand jury are to have any meaning in tax cases.

■ The issue is easier here, however, because I find that the defense has failed to provide any evidence of IRS bad faith that would justify an evidentiary hearing, much less suppression. First, on its face, the government met the terms of the statute. The IRS issued its last summons in November of 1999, nine months before it referred the case to the DOJ in August, 2000. The defense makes no showing to indicate that the government delayed this referral in bad faith or otherwise reached an earlier "institutional commitment" to prosecute.

First, the statements on the fraud referral to CID represented the opinion of a single revenue agent, which is certainly far from "an institutional commitment." *See MacKenzie*, 777 F.2d at 819 (explaining

that view of a single revenue agent is not the same thing as "institutional posture"); *see also LaSalle*, 437 U.S. at 314, 98 S.Ct. 2357 (describing internal IRS review process that is both "multilayered and thorough").[7]

Second, the CID inquiry in this case was not simply a hollow reenactment of Winsten's investigation, as the defendant suggests. The summonses issued by Winsten in February of 1998—which Mehta does not challenge—were confined to limited categories of records and only for two years. Once Winsten uncovered evidence of fraud, he referred the case to CID and ceased further investigation. At that point, CID Special Agent Gianoukos issued additional summonses encompassing a broader category of records and a three-year time span. I cannot find an "institutional commitment" to refer to DOJ before the CID tried to determine the breadth of the problem. Nor can I conclude that the IRS had abandoned all hope of civil proceedings before the CID summons in 1998. Indeed, the IRS signaled its decision not to abandon civil collection efforts by obtaining Mehta's assent to toll the civil statute of limitations for the 1995 tax year.

Third, the time line of this case does not imply a merely pretextual delay in DOJ referral. CID did not internally recommend Mehta for prosecution to IRS District Counsel until May of 2000, six months after the last summons had been issued. The IRS District Counsel, in turn, did not submit a concurring recommendation until

---

7. Indeed, the government makes a good point that such a position would force more and more cases instantly to DOJ and criminal prosecution, even when that may not be warranted. Taken to its logical conclusion, the position that a single agent could bind the IRS institutionally "would mean that decisions to prosecute would effectively be made at the point when a civil revenue agent uncovers what he or she believes to be evidence of fraud; that upon such a discovery all cases would be required to go directly from the Examination Division [of the IRS] to the Justice Department; and that CID would never be authorized to issue summonses or conduct investigations."

July 28, 2000, and the IRS did not refer the case until August 24, 2000. If, as the defendant would have me find, the IRS were simply riding the CID investigation as a discovery vehicle in service of DOJ's ultimate prosecution, one would have expected the referral to follow much faster on the heels of the final CID summons.

In short, there is no basis on this record for an evidentiary hearing, and surely no basis for a dismissal of the charges or suppression of the evidence.

**SO ORDERED.**

*ORDER RE: DEFENDANT'S MOTION FOR RECONSIDERATION OF MAGISTRATE'S ORDER THAT DEFENDANT MAKE FURTHER EXPERT DISCLOSURES, AND DEFENDANT'S MOTION TO SUPPRESS*

For the reasons set forth in the accompanying Memorandum and Order of the same date, Mukund N. Mehta's Motion to Suppress for Misuses of IRS Subpoena Power [document # 28] is DENIED, and his Motion for Reconsideration of Magistrate Judge's Order [document # 48] is hereby GRANTED and the Magistrate Judge's Order is REVERSED.

**SO ORDERED.**